[712 NYS2d 471]

In the Matter of BEEKMAN HILL ASSOCIATION, INC., et al., Appellants, v JAMES CHIN et al., Respondents, and TRUMP 845 UN GP, L. L. C., Intervenor-Respondent.

First Department, August 3, 2000

## APPEARANCES OF COUNSEL

*Peter L. Zimroth* of counsel (*Michael B. Gerrard, Donald M. Elliott* and *Anne Adams Rabbino* on the brief; *Arnold & Porter,* and *Hollyer Brady Smith Troxell Barrett Rockett Hines & Mone, L. L. P.,* attorneys), for appellants.

*Joseph I. Lauer* of counsel (*Francis F. Caputo, Gabriel Taussig* and *Robin Binder* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for City respondents.

*Jeffrey L. Braun* of counsel (*Jay Goldberg* on the brief; *Rosenman & Colin, L. L. P.,* and *Law Offices of Jay Goldberg, P. C.,* attorneys), for 845 UN Limited Partnership, respondent, and Trump 845 UN GP, L. L. C., intervenor-respondent.

*Richard S. Fischbein* of counsel (*Howard B. Hornstein, Marvin B. Mitzner* and *Gil Feder* on the brief; *Fischbein Badillo Wagner Harding,* attorneys), for Daewoo 845 UN, L. L. C., respondent.

*Paul A. Straus* of counsel (*Battle Fowler, L. L. P.,* attorneys), for Associated Builders & Owners of Greater New York, *amicus curiae.*

**OPINION OF THE COURT**

SULLIVAN, P. J.

In this CPLR article 78 proceeding, petitioners appeal from the Supreme Court's denial of their application to annul a determination by the New York City Board of Standards and Appeals (BSA) sustaining the refusal of the Department of Buildings (DOB) to revoke a building permit for a building presently under construction at 845 First Avenue in Manhattan. Petitioners include several community organizations that oppose construction of the building. Respondents are the municipal officials and agencies responsible for the determinations being challenged, as well as the limited partnership, including the general and limited partners, that owns the zoning lot upon which the building is being constructed.[1]

Additionally, this Court granted permission to the Associated Builders & Owners of Greater New York, a real estate industry association, to file an *amicus curiae* brief in opposition to petitioners' appeal.

This appeal requires us, *inter alia,* to determine whether the Supreme Court applied the proper standard of review under CPLR article 78 in evaluating petitioners' challenge to the BSA's determination. Assuming the correct standard was applied, we must then determine whether the Supreme Court properly found that the BSA's interpretation of the relevant provisions of the New York City Zoning Resolution (Zoning Resolution) had a rational basis. We answer both questions af-

---

1. The limited partnership, 845 UN Limited Partnership, and the limited partner, Daewoo 845 UN, L. L. C., were named as respondents in this proceeding. The general partner, Trump 845 UN GP, L. L. C., was permitted by stipulation to intervene as a respondent. Collectively, they will be referred to as "Owners."

firmatively and affirm the Supreme Court's order dismissing the proceeding.

On October 22, 1998, DOB issued a building permit authorizing the construction of a 70-story, primarily residential building on a zoning lot located on the west side of First Avenue, between 47th and 48th Streets (Building). The subject zoning lot (zoning lot) was created through a zoning lot merger pursuant to Zoning Resolution (ZR) § 12-10 ([Zoning Lot] [d]), which permits the sale or transfer of development rights between contiguous lots in order to create additional development rights on one portion of the merged zoning lot. The zoning lot is located in two different commercial zoning districts, a C5-2 district and a C1-9 district, and has a combined area of 89,772 square feet. The building permit authorizes the development of the C5-2 portion of the zoning lot with a mixed building,[2] and allows the transfer of 526,105 square feet of floor area from the C1-9 portion to the C5-2 portion.

On February 4, 1999, the attorney for petitioner Beekman Hill Association (Beekman Hill) wrote to DOB requesting that it revoke the building permit and issue a stop work order on the ground that the proposed Building violated the Zoning Resolution in two ways. First, Beekman Hill argued that the Building cannot be built pursuant to the residential tower regulations set forth in ZR § 23-65, but must instead be built in accordance with the Tower-on-a-base regulations of ZR § 23-652.[3] Second, Beekman Hill contended that under the "split-lot" provisions of the Zoning Resolution, floor area rights from C1-9 portion of the zoning lot could not be transferred to the C5-2 portion.

By letter dated April 21, 1999, the DOB Commissioner (Commissioner) denied Beekman Hill's request for revocation of the building permit. The Commissioner's ruling rejected both of Beekman Hill's key contentions. He found that the Tower-on-a-base provisions of ZR § 23-652 did not apply in C5-2 zoning districts, and that the Building may utilize floor area gener-

---

**2.** A "mixed building" is a building in a commercial district used partly for residential use and partly for community facility or commercial use. (ZR § 12-10.)

**3.** The Tower-on-a-base form generally requires that a building have a base with a minimum height of 60 feet extending along the entire length of the street frontage of the zoning lot, with the tower rising above the base (ZR § 23-652 [b] [1], [2]). This form also indirectly limits tower height by requiring that 55% (or more) of the building's total floor area be located below a height of 150 feet (ZR § 23-652 [a] [3]). This is sometimes referred to as the "wedding cake" design.

ated in the C1-9 portion of the zoning lot since the floor area regulations applicable to C5-2 and C1-9 portions of the zoning lot were the same.

On April 28, 1999, Beekman Hill and other petitioners filed an appeal with the BSA. The BSA, a five-member body that includes at least one planner, a licensed professional engineer and a registered architect, is vested with exclusive jurisdiction to determine appeals from DOB decisions (NY City Charter § 659 [a], [b]; § 666 [6] [a]). In support of their appeal, petitioners submitted a statement of facts and legal memorandum reiterating their two primary contentions. DOB and the Owners made written submissions urging affirmance of the Commissioner's determination. On June 23, 1999, the BSA conducted a lengthy public hearing at which representatives of all parties, as well as public officials and interested members of the public, gave testimony. The BSA also accepted posthearing submissions.

On September 28, 1999, the BSA voted unanimously to confirm the Commissioner's determination and denied the appeal. In its resolution, the BSA explicitly stated that the statutory structure of ZR § 35-63, as well as the legislative history of the Tower-on-a-base amendments, supported the Commissioner's determination that the Tower-on-a-base regulations did not apply to C5-2 zoning districts. The BSA's resolution further stated that consistent with DOB's longstanding interpretation of the split-lot provisions of the Zoning Resolution, where a zoning lot is divided by a district boundary but the two districts have identical regulations for a particular aspect, such as maximum floor area, then the divided zoning lot would not be considered a split-lot for purposes of that particular aspect. The BSA also concluded that petitioners' interpretation of the Zoning Resolution's split-lot provisions was overbroad and would render superfluous many other split-lot provisions in the Zoning Resolution.

Petitioners thereafter commenced the instant article 78 proceeding seeking vacatur of the BSA's determination and an order directing DOB to revoke the building permit and issue a stop work order. Petitioners' legal arguments were the same as those made before the DOB and BSA: that the Tower-on-a-base regulations were applicable and prohibited construction of the tower portion of the Building, and that the transfer of development rights from the C1-9 portion to the C5-2 portion of the zoning lot violated the Zoning Resolution's split-lot provisions.

The Supreme Court denied and dismissed the article 78 proceeding. With respect to petitioners' argument that the Tower-on-a-base regulations were applicable to C5-2 districts, the court stated that C5-2 districts were "conspicuously missing" from the list of districts in ZR § 35-63 (a) that have been specifically designated as requiring the Tower-on-a-base design. The court also found that notwithstanding the Owners' election to be governed by the residential tower regulations of ZR § 23-65, which incorporates a "Tower-on-a-base carve-out" allegedly making the Tower-on-a-base regulations applicable here, "this [wa]s plainly an example of inadvertent draftmanship."

In the court's view, the drafter's failure to make reference to the Tower-on-a-base regulations in subdivision (c) of ZR § 35-63, which governs C5-2 districts, as had been done in subdivision (a) of the same section, was persuasive evidence that C5-2 districts were not subject to the Tower-on-a-base regulations. The court also found that the legislative history of the Tower-on-a-base regulations and the planning rationale underlying them further supported the BSA's determination. In contrast, the court found "nothing in the legislative history to support [p]etitioners' interpretation."

The Supreme Court also confirmed the BSA's interpretation of the split-lot provisions of the Zoning Resolution. It concluded that the enumeration of individual bulk regulations in ZR § 23-17 suggests that the split-lot provisions become applicable only on a category-by-category basis, and that petitioners' interpretation would render other, more specific split-lot provisions in the Zoning Resolution superfluous. Lastly, the Supreme Court confirmed that it had applied a rational basis standard in reviewing the BSA determination.

■ Petitioners' first argument on appeal is that the Supreme Court applied the wrong standard of review in this article 78 proceeding and erroneously deferred to an administrative agency on questions of law. They claim that this case presented issues of pure statutory construction for the court's de novo review, and that the Supreme Court's deference to the DOB and BSA "government functionaries" was inappropriate. Petitioners argue that any inquiry into the legislative history of the Zoning Resolution is unwarranted because the provisions are unambiguous on their face. We disagree.

" 'It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature, and where the statutory language is clear and unambiguous, the

court should construe it so as to give effect to the plain meaning of the words used.'" (*Doctors Council v New York City Employees' Retirement Sys.*, 71 NY2d 669, 674-675, quoting *Patrolmen's Benevolent Assn. v City of New York*, 41 NY2d 205, 208.) Questions of pure legal interpretation of statutory language do not warrant judicial deference to administrative expertise (*Matter of Toys "R" Us v Silva*, 89 NY2d 411, 419), unless such language "is not altogether clear and unambiguous" (*Matter of Bockis v Kayser*, 112 AD2d 222, 223). Thus, courts will defer to an agency's construction where statutory language is "special or technical and does not consist of common words of clear import" (*Matter of New York State Assn. of Life Underwriters v New York State Banking Dept.*, 83 NY2d 353, 360 ["the 'incidental powers' clause in Banking Law § 96 (1) does not consist of common words of clear import, and that clause is susceptible to differing interpretation"]), or where it suffers from some "fundamental ambiguity" (*Matter of Golf v New York State Dept. of Social Servs.*, 91 NY2d 656, 667).

Contrary to petitioners' contention, the provisions of the Zoning Resolution at issue here are not clear and unambiguous. As detailed below, petitioners' claim that the Tower-on-a-base regulations apply to mixed buildings in C5-2 districts is based on a strained reading of ZR § 35-63, and that section's cross reference to ZR § 23-65. Similarly, the language used in the split-lot provisions is also susceptible of conflicting interpretations. Accordingly, deference to the BSA's construction of these provisions of the Zoning Resolution was clearly authorized.

*Matter of Raritan Dev. Corp. v Silva* (91 NY2d 98), cited by petitioners, is clearly distinguishable. There, the DOB and BSA interpreted the language of ZR § 12-10 (Floor area) stating that the *"floor area* of a *building* shall not include * * * cellar* space" to mean only *habitable* cellar space. Rejecting this administrative construction, the Court of Appeals held that such limitation conflicted with the "plain statutory language," which "could not be clearer" (*supra*, at 103). The language used in the cross-referenced provisions of the Zoning Resolution in this case falls well short of the level of clarity in *Matter of Raritan*.

■ Petitioners next contend that the Building may not be constructed in accordance with the residential tower regulations of ZR § 23-65, but instead is governed by the Tower-on-a-base regulations of ZR § 23-652. All parties agree that the controlling provision is ZR § 35-63, titled "Special Tower Regulations for Mixed Buildings." ZR § 35-63 sets forth the

four types of tower regulations—the residential tower regulations (ZR § 23-65), the commercial tower regulations (ZR § 33-45), the Towers on small lots regulations (ZR § 23-651) or the Tower-on-a-base regulations (ZR § 23-652)—that are applicable to mixed buildings in certain sets of zoning districts.

ZR § 35-63 contains three subdivisions, each of which pertains to a separate grouping of commercial zoning districts. ZR § 35-63 (a) covers C1 or C2 districts mapped within R9 or R10 districts as well as C1-8, C1-9, C2-7 and C2-8 districts. Subdivision (a) provides that in these aforementioned districts "a *mixed building* that meets the requirements of a tower-on-a-base set forth in Section 23-65 (Tower Regulations) shall be governed by the provisions of Section 23-652 (Tower-on-a-base)."

ZR § 35-63 (b) covers C4-6, C5-1 and C6-3 districts, and provides that the residential portion of mixed buildings which meet certain requirements "may be constructed in conformance with the provisions of Section 23-65 [Tower Regulations]."

ZR § 35-63 (c) covers C4-7, C5-2, C5-3, C5-4, C5-5, C6-4, C6-5, C6-6, C6-7, C6-8 and C6-9 districts, and provides that the applicable Tower regulations for mixed buildings in these districts are the commercial tower regulations (ZR § 33-45). Subdivision (c), however, further provides that in some of the districts enumerated, including C5-2 districts, when no more than two stories of a mixed building are occupied by nonresidential uses, the applicable tower regulations may also be either the residential tower regulations (ZR § 23-65) or the Towers on small lots regulations (ZR § 23-651).[4]

Thus, as can be seen from the structure of the three subdivisions of ZR § 35-63, only subdivision (a) makes any reference to the Tower-on-a-base regulations in ZR § 23-652. More significantly, the list of districts in subdivision (a) that "shall be governed by the provisions of Section 23-652 (Tower-on-a-base)" does not include C5-2 districts. Thus, it is clear from the structure of ZR § 35-63 that C5-2 districts are governed by subdivision (c), not subdivision (a). Petitioners concede that subdivision (c) governs C5-2 districts, but contend that its cross-reference to ZR § 23-65 (residential tower regulations) makes the Tower-on-a-base regulations of ZR § 23-652 applicable.

ZR § 23-65, titled "Tower Regulations," applies by its terms to R9 and R10 residential districts. Although not separated by

---

4. The Towers on small lots regulations do not apply to this Building because the merged zoning lot exceeds 20,000 square feet (ZR § 23-651).

subdivisions, the section has three distinct parts. The first part, consisting of the first three paragraphs, describes the requirements for the residential tower regulations, which, *inter alia*, permit the construction of a tower in residential buildings that occupy not more than 40 percent of the zoning lot.

The fourth paragraph of ZR § 23-65 provides an exception, making the residential tower regulations inapplicable where the building is within 100 feet of a public park (park exception).

The fifth paragraph of ZR § 23-65, upon which petitioners rely, provides an additional exception to the residential tower regulations. It provides that such regulations "shall not apply" to any development which: (i) is located on a wide street; (ii) is within 125 feet from such wide street frontage along the short dimension of the block or within 100 feet from such wide street frontage along the long dimension; and (iii) contains more than 25 percent of its total floor area in residential use. If the building meets the three criteria in this exception, ZR § 23-65 states that the building "shall be subject to the provisions of Section 23-652 (Tower-on-a-base)." This is the so-called "Tower-on-a-base exception."

Petitioners argue that the Building in this case meets the criteria of the Tower-on-a-base exception of ZR § 23-65, since it is located on a wide street (First Avenue), is within 125 feet of the First Avenue frontage along the short dimension of the block, and devotes more than 25 percent of its floor area to residential use. Therefore, they assert, the Building is subject to the Tower-on-a-base regulations of ZR § 23-652. Several factors persuade us that the BSA's contrary interpretation of these complex, interlocking provisions is on sounder footing than petitioners'.

A comparison of the language used in subdivisions (a) and (c) of ZR § 35-63 strongly suggests that mixed buildings in C5-2 districts were not intended to be subject to the Tower-on-a-base regulations. ZR § 35-63 (a), which does not apply to C5-2 districts, states in relevant part: "In C1 or C2 Districts mapped within R9 or R10 Districts, or in C1-8, C1-9, C2-7 or C2-8 Districts, a *mixed building* that meets the requirements of a tower-on-a-base set forth in Section 23-65 (Tower Regulations) shall be governed by the provisions of Section 23-652 (Tower-on-a-base)" (emphasis in original).

As is readily apparent, subdivision (a) of ZR § 35-63 makes explicit reference to the Tower-on-a-base regulations of ZR § 23-652, and specifically provides that such regulations will

apply if the building meets the criteria in the Tower-on-a-base exception of ZR § 23-65. Thus, the potential applicability of the Tower-on-a-base regulations in the districts listed in subdivision (a) is stated in clear and unequivocal terms.

Subdivision (c) of ZR § 35-63 stands in stark contrast. It makes no reference at all to the Tower-on-a-base regulations in ZR § 23-652, or the criteria for the Tower-on-a-base exception of ZR § 23-65. Rather, by its express terms, it provides that mixed buildings in C5-2 districts are governed by the commercial tower regulations (ZR § 33-45). Or, if the building has no more than two stories of nonresidential use, it also may be governed by the residential tower regulations (ZR § 23-65) or the Towers on small lots regulations (ZR § 23-651).

We reject petitioners' assertion that this glaring textual inconsistency should be accorded no legal significance. The argument ignores the "fundamental rule of statutory construction that a statute or legislative act is to be construed as a whole, and that all parts of an act are to be read and construed together to determine the legislative intent." (McKinney's Cons Law of NY, Book 1, Statutes § 97.)

Reading subdivisions (a) and (c) together, as we must, the only conclusion to be drawn is that the drafters did not intend that mixed buildings in C5-2 districts would be subject to the Tower-on-a-base regulations. Had the Legislature so intended, it could easily have added C5-2 districts to those enumerated in subdivision (a) of ZR § 35-63. Given that these two subdivisions are contained within a single section, and relate to the same issue of which tower regulations apply to mixed buildings in particular districts, the omission of a direct reference to the Tower-on-a-base regulations in subdivision (c) may reasonably be construed as evidencing a legislative intent that such regulations do not apply to C5-2 districts (*see, Matter of Schultz Mgt. v Board of Stds. & Appeals*, 103 AD2d 687, 689, *affd* 64 NY2d 1057 [if a statute describes the particular situation in which it is to apply, an irrefutable conclusion must be drawn that what is omitted or not included was intended to be omitted or excluded]; McKinney's Cons Laws of NY, Book 1, Statutes § 240).[5]

We further agree with the Supreme Court's conclusion that the cross-reference in subdivision (c) of ZR § 35-63 to "Sec-

---

5. We also note that petitioners have not cited a single instance in the Zoning Resolution where it is stated that the Tower-on-a-base regulations apply to C5-2 districts.

tion[ ] 23-65 [Tower Regulations]" refers only to the substantive residential tower regulations of ZR § 23-65, and not to the two exceptions also present in the statute. A comparison between subdivisions (a) and (c) of ZR § 35-63 is again helpful. In subdivision (a) of ZR § 35-63, when referring to the Tower-on-a-base exception, the drafters made explicit reference to "the requirements of a tower-on-a-base set forth in Section 23-65 (Tower Regulations)." However, in subdivisions (b) and (c) of ZR § 35-63 reference is made only to "Sections 23-65 [Tower Regulations] or 23-651 [Towers on small lots]," without any reference to the Tower-on-a-base exception or the criteria for its applicability. A reasonable construction of this statutory inconsistency, adopted by the BSA, is that the reference in subdivision (c) of ZR § 35-63 to "Section [ ] 23-65 [Tower Regulations]" pertains solely to the actual, substantive residential tower regulations, and not to the park and Tower-on-a-base exceptions (*see, Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 458 [reference in former Insurance Law § 671 (2) (a) to " 'lost earnings pursuant to paragraph (b) of subdivision one of this section' " refers only to so much of paragraph (b) of subdivision (1) which defines lost earnings, and not to the $1,000 limitation, which "is not part and parcel of the definition of lost earnings"]).

Petitioners' interpretation is far more strained. In order to conclude that the drafters of ZR § 35-63 intended that mixed buildings in C5-2 districts were to be governed by the Tower-on-a-base regulations, this Court would have to overlook several statutory quirks, including: (1) the drafters' omission of C5-2 districts from subdivision (a) of ZR § 35-63, which contains the only reference in the entire section to the Tower-on-a-base regulations; (2) that subdivision (c) of ZR § 35-63, which expressly governs C5-2 districts, makes no reference at all to the Tower-on-a-base regulations; (3) that subdivisions (a) and (c) of ZR § 35-63 allegedly make the Tower-on-a-base regulations of ZR § 23-652 applicable by two completely different methods, one by direct reference thereto and another by cross-reference to a separate section, ZR § 23-65; (4) that the cross-reference to ZR § 23-65 is made not only to the substantive portions of that section, but also to an exception which, in turn, makes those substantive provisions inapplicable; and (5) that the cross-reference to ZR § 23-65 makes the Tower-on-a-base regulations applicable to C5-2 districts, even though ZR § 23-65, by its terms, applies only in R9 and R10 districts. The determination to reject such a tortured reading of these interlocking statutes clearly had a rational basis.

The BSA's interpretation of ZR § 35-63 is also supported by the legislative history and rationale underlying the adoption of the 1994 amendments to the Zoning Resolution, which added the Tower-on-a-base regulations. As this Court recently stated, "the fundamental rule in construing any statute, or in this case an amendment to the City's Zoning Resolution, is to ascertain and give effect to the intention of the legislative body" (*City of New York v Stringfellow's of N. Y.*, 253 AD2d 110, 115-116, *lv dismissed* 93 NY2d 916; *see also, Matter of Sutka v Conners,* 73 NY2d 395, 403 [in matters of statutory interpretation, legislative intent is the " 'great and controlling principle' "]; McKinney's Cons Laws of NY, Book 1, Statutes § 92).

The New York City Charter requires that amendments to the Zoning Resolution be reviewed and approved by the City Planning Commission (CPC) (NY City Charter § 200 [a] [1]), and then forwarded to the City Council for approval, disapproval or modification (City Charter § 200 [a] [2]; § 197-d [b] [1]). When the CPC approves the text of a prospective zoning amendment, it issues a report that is filed with the City Council (City Charter § 197-d [a]).

The CPC Report filed in connection with the 1994 Tower-on-a-base amendments states in unequivocal terms: "The proposed changes would be applicable to buildings that are entirely or partially residential in R9, R10, C1-8, C2-7, and C2-8 zoning district [*sic*] or in C1 or C2 districts mapped within R9 and R10 districts." Significantly, in this report prepared by the body responsible for drafting the Tower-on-a-base amendments, C5-2 districts are not included among the districts to which the proposed amendments were to apply. In fact, nowhere in the narrative text of the CPC Report or the proposed amendments is there a single reference or suggestion that the Tower-on-a-base amendments were applicable to C5-2 zoning districts. Thus, this important piece of legislative history (*see, Stringfellow's of N. Y. v City of New York*, 91 NY2d 382, 401) supports the BSA's conclusion that the Tower-on-a-base regulations were inapplicable in this case.

Additionally, a Land Use Review Application (Application), filed by the Department of City Planning (DCP) in connection with the zoning amendment proposal for the Tower-on-a-base regulations, stated "Applicable districts: R9, R10, C1-8, C1-9, C2-7 or C2-8 Districts; and C1 or C2 overlay districts." Similarly, the Environmental Assessment Statement (EAS) filed with the proposed zoning text amendments stated that the amendment applied to these same districts. Moreover, the

EAS incorporated several maps of the Manhattan zoning districts identifying the areas which would be affected by the proposed Tower-on-a-base regulations. Neither the Application, the EAS narrative statement nor the EAS maps indicated that C5-2 districts were to be covered by the Tower-on-a-base amendments.

While petitioners downplay the failure to identify C5-2 districts in the shaded maps as merely reflective of the fact that C5-2 districts are not "automatically" subject to the Tower-on-a-base regulations, such argument ignores the fact that even the districts listed in subdivision (a) of ZR § 35-63 are not automatically subject to the Tower-on-a-base regulations; rather, they must also meet the criteria in ZR § 23-65. Additionally, since the purpose of an EAS is to determine the environmental significance or nonsignificance of the proposed zoning text changes (see, *Matter of Merson v McNally*, 90 NY2d 742, 751; 6 NYCRR 617.2 [m]), it would be imperative to identify all of the potentially affected areas in the shaded maps, not simply those automatically covered by the new amendments. Moreover, these maps are entirely consistent with the CPC report and the statutory language in ZR § 35-63 (a) in their exclusion of C5-2 districts from those subject to the Tower-on-a-base regulations.[6]

We also find persuasive respondents' contention that exclusion of C5-2 districts from the Tower-on-a-base regulations is consistent with the underlying planning rationale of the proposed amendments. As the CPC Report clearly demonstrates, the Tower-on-a-base amendments were clearly aimed at reducing the numbers of excessively tall towers by prohibiting use of the "plaza bonus" in "high-density residential districts" and "reinforcing the traditional streetwall character of the districts." It is equally clear the "high-density residential districts" referred to throughout the CPC Report are R9, R10, C1-8, C1-9, C2-7, C2-8 districts and C1 or C2 districts mapped within R9 and R10 districts.

The Owners and City respondents posit that because streetwall continuity is an important and desired feature for these largely residential neighborhoods, it makes good sense to apply the Tower-on-a-base regulations in these districts to effectuate the goals of the Tower-on-a-base amendments. However, in high-density commercial zoning districts, such as the C5-2

6. Also supportive of this conclusion is a 1995 memorandum from the DCP stating that the Tower-on-a-base regulations "do not apply in C4, C5, and C6 districts."

district here, the Tower-on-a-base regulations would contribute far less to these goals because streetwall continuity is far from the norm in such districts and many tall towers already exist. While petitioners take issue with this rationale, they do not, and cannot, dispute that high-density commercial districts, such as C5-2 districts, were not the focus of the Tower-on-a-base amendments.

Additionally, it is undeniable that had respondent Owners elected to be governed by the commercial tower regulations of ZR § 33-45 instead of the residential tower regulations of ZR § 23-65, a choice they were entitled to make pursuant to ZR § 35-63 (c), they would have been authorized to build a tower that did not have to comply with the Tower-on-a-base format. Accordingly, it would be illogical to permit the construction of a tower pursuant to the commercial tower regulations while prohibiting the construction of a tower on the same zoning lot under the residential tower regulations.

In sum, the BSA's conclusion that the language, structure and legislative history of ZR § 35-63 and the 1994 Tower-on-a-base amendments demonstrate that the amendments do not apply to C5-2 districts has a rational basis and we will not disturb it (see, Matter of Dudyshyn Contr. Co. v Zoning Bd. of Appeals, 255 AD2d 445 [a zoning board's determination should not be cast aside unless there is a showing of illegality, arbitrariness or an abuse of discretion]).

█ Petitioners next contend that the "split-lot" provisions of article VII (ch 7) of the Zoning Resolution prohibit a transfer of floor area across zoning district boundary lines whenever the two districts are subject to any different use, bulk, off-street parking, loading or other regulations. However, as the Supreme Court held, petitioners' interpretation of the relevant provisions of the Zoning Resolution is overbroad and would render other, more specific split-lot provisions superfluous. Additionally, it is contrary to the BSA's long-standing, rational application of these provisions.

Petitioners rely primarily on ZR § 77-01, which provides that the split-lot provisions of article VII (ch 7) of the Zoning Resolution are applicable "[w]henever any *zoning lot* is located in two or more districts in which different *uses* are permitted, or in which different *use, bulk, accessory* off-street parking and loading, or other regulations apply." Once the split-lot provisions are found to be applicable, ZR § 77-02 mandates that "each portion of such *zoning lot* shall be regulated by all the provisions applicable to the district in which such portion of the *zoning lot* is located."

Petitioners argue that the plain language of ZR § 77-02 "means that all floor areas must be used only in the district in which the floor area is generated and that floor area may not be transferred from one zoning district to another." In our view, the actual language of ZR § 77-02 states something different from what petitioners say it means. Concededly, however, the language does not unambiguously refute petitioners' interpretation. Accordingly, as with the issue of the appropriate tower regulations, resort to the rules of statutory construction and deference to the agency's interpretation of the statute it administers become appropriate (*see, Matter of Golf v New York State Dept of Social Servs.*, 91 NY2d, *supra*, at 667).

The flaws in petitioners' overexpansive interpretation of ZR § 77-01 are apparent. Initially, petitioners' reading of ZR § 77-01 would necessarily mean that in a zoning lot that is divided by a district boundary, even a single difference among the various use and bulk regulations applicable to each district would render the split-lot provisions applicable for all purposes. If this reading were correct, however, all divided zoning lots would be subject to the split-lot provisions since no two zoning districts contain identical use, bulk and other zoning regulations. Thus, the language in ZR § 77-01 listing different types of regulations would itself be superfluous since any zoning lot which straddled a district boundary would automatically be subject to the split-lot provisions.

It is a basic principle of statutory construction that "all parts of an enactment shall be harmonized with each other as well as with the general intent of the whole enactment, and meaning and effect given to all provisions of the statute." (McKinney's Cons Laws of NY, Book 1, Statutes § 98, at 220.) The BSA's interpretation of the split-lot provisions avoids any conflict with this principle by giving meaning to the language in ZR § 77-01, as well to the more specific split-lot provisions in the Zoning Resolution. The DOB's longstanding interpretation of ZR § 77-01 requires that a zoning lot be treated as a split-lot only with respect to the application of individual use or bulk regulations that do not apply to both portions of the zoning lot. By applying the split-lot provisions on a regulation-by-regulation basis, a zoning lot may be viewed as a split-lot for purposes of applying one set of zoning regulations and as an individual lot for purposes of applying another set of regulations.

The correctness of the BSA's interpretation is illustrated by reference to two more specific split-lot provisions relevant to

this case. ZR § 23-68 is the split-lot provision that specifically addresses height, setback and tower regulations. ZR § 23-68 provides that the split-lot provisions of article VII (ch 7) apply where "a *zoning lot* is divided by a boundary between districts, or is subject to other regulations resulting in different height and setback regulations, or whenever a *zoning lot* is divided by a boundary between a district to which the provisions of Section 23-65 (Tower Regulations) apply and a district to which such provisions do not apply" (emphasis in original). It is clear that this provision would be entirely redundant if petitioners' interpretation of ZR § 77-01 were to prevail. There would be no need for a provision to mandate the applicability of the split-lot requirements in these specific areas if any difference in regulations was sufficient to invoke the split-lot provisions, as petitioners contend.

More important, ZR § 23-68 refutes petitioners' argument that the split-lot provisions are applicable here because of the allegedly different tower regulations for C1-9 and C5-2 districts. As we have already upheld the BSA's determination that the residential tower regulations in ZR § 23-65 apply to this mixed building in a C5-2 district, and it is undisputed that they apply in a C1-9 district,[7] the same tower regulations apply to both districts. Thus, under ZR § 23-68, the split-lot provisions do not apply with respect to the tower regulations governing this building.

Petitioners' interpretation also runs counter to ZR § 23-17, another provision mandating the application of the split-lot provisions in divided zoning districts where certain, individual bulk regulations are different. ZR § 23-17 states that the split-lot provisions of article VII (ch 7) shall apply "whenever a *zoning lot* is divided by a boundary between districts or is subject to *bulk* regulations resulting in different minimum required *open space ratios*, different maximum *floor area ratios*, different *lot coverages*, or *open space ratios* and *lot coverages*, on portions of the *zoning lot*" (emphasis in original). Again, the particularity of this provision would be entirely unnecessary if, as petitioners contend, any difference in the use or bulk regulations for the two districts divided by a boundary was sufficient to trigger the split-lot provisions.

Moreover, ZR § 23-17 clearly demonstrates that the split-lot provisions do not apply with respect to floor area in the man-

---

7. The C1-9 portion of the zoning lot is subject to the residential tower regulations (ZR § 23-65) instead of the Tower-on-a-base regulations (ZR § 23-652) pursuant to ZR § 35-63 (a) since it does not meet the Tower-on-a-base criteria set forth in ZR § 23-65, to wit, the lot does not front on a wide street.

ner claimed by petitioners. Mixed buildings in C1-9 and C5-2 districts are both governed by the bulk requirements applicable to residential buildings in R10 districts (ZR § 35-23). As the maximum basic floor area ratio (FAR) for R10 districts is 10.0 (ZR § 23-15), then the maximum FAR of 10.0 applies to both C1-9 and C5-2 districts. Thus, since the maximum FAR is the same in the two districts, the split-lot provisions do not apply for purposes of maximum FAR. To interpret ZR § 77-01 to mean that the difference in other bulk regulations unrelated to FAR would render the zoning lot a split-lot for all purposes, including for purposes of maximum FAR, would be inconsistent with the basic thrust of ZR § 23-17.

In contrast, DOB has consistently interpreted the split-lot provisions of the Zoning Resolution to authorize the use of residential floor area from anywhere on a divided zoning lot where, as here, the basic maximum FAR is the same for each portion of the zoning lot.[8] Indeed, where the two portions of a zoning lot are subject to the same basic FAR, petitioners fail to cite any logical reason for treating the two portions of the zoning lot as a split-lot for purposes of maximum FAR.

Other provisions in the Zoning Resolution support the conclusion that the entire floor area of a zoning lot divided by a district boundary may be utilized, as long as the FAR for each portion (district) of the zoning lot is the same. ZR § 33-17, which is applicable to commercial buildings in commercial districts, provides that the split-lot requirements are applicable where "a *zoning lot* is divided by a boundary between districts or is subject to other regulations resulting in different maximum *floor area ratios* on portions of the *zoning lot*." Similarly, ZR § 43-16 provides that the split-lot requirements apply to manufacturing buildings "whenever a *zoning lot* is divided by a boundary between [manufacturing] districts with different maximum *floor area ratios*."

While these provisions explicitly state that the split-lot provisions will apply in divided lots where the maximum FAR is different, they presumably mandate the inverse, i.e., that where the maximum FAR is the same, the split-lot provisions will not apply. However, that conclusion could not be reached if we accepted petitioners' argument that any difference in use or bulk regulations between two portions of a divided zoning lot would trigger the split-lot provisions. Accordingly, we agree

---

**8.** Respondents produced six documents from high-level DOB personnel which confirmed its long-standing interpretation of the split-lot provisions.

with the BSA and the Supreme Court that the split-lot provisions apply on a regulation-by-regulation basis and, therefore, it is irrelevant that the C5-2 portion of the zoning lot is governed by different use regulations than the C1-9 portion.[9]

Accordingly, the order of the Supreme Court, New York County (Nicholas Figueroa, J.), entered December 9, 1999, which denied and dismissed the petition brought pursuant to CPLR article 78 seeking to annul a determination of the Board of Standards and Appeals that confirmed the Department of Buildings' refusal to revoke a building permit, should be affirmed, without costs or disbursements.

NARDELLI, MAZZARELLI and SAXE, JJ., concur.

Order, Supreme Court, New York County, entered December 9, 1999, affirmed, without costs or disbursements.

---

9. Similarly unavailing is petitioners' contention that the split-lot provisions prohibit this tower because a residential tower bonus was generated in the C5-2 portion of the zoning lot while the Zoning Resolution prohibits such bonuses in C1-9 districts. Since the tower bonus was derived from floor area exclusively in the C5-2 portion, where the tower is being built, there was no transfer across district lines and ZR § 77-02 is not implicated.