[770 NYS2d 346]

In the Matter of NEW YORK CITY COUNCIL et al., Respondents, v CITY OF NEW YORK et al., Appellants. CHELSEA PROPERTY OWNERS ASSOCIATION et al., Intervenors-Appellants.

First Department, January 15, 2004

APPEARANCES OF COUNSEL

*Emery Cuti Brinckerhoff & Abady PC (John R. Cuti, Richard D. Emery* and *Ilann M. Maazel* of counsel), for respondents.

*Michael A. Cardozo, Corporation Counsel,* New York City (*Mordecai Newman, Larry A. Sonnenshein* and *Chris Reo* of counsel), for appellants.

*Gibson, Dunn & Crutcher, LLP (Randy M. Mastro* of counsel), for intervenors-appellants.

**OPINION OF THE COURT**

GONZALEZ, J.

This appeal requires us to determine whether Supreme Court properly directed the City of New York to submit a plan to

demolish an elevated railway on Manhattan's West Side to the Uniform Land Use Review Procedure (ULURP) set forth in the New York City Charter. We conclude that neither of the two grounds cited by Supreme Court as bases for ULURP review, namely, that the plan involves an acquisition of property by the City and that it requires a change in the City Map, are supportable. Accordingly, we reverse the order and judgment and dismiss the petition.

In this CPLR article 78 proceeding, petitioners seek to compel respondent City of New York (City) to submit a pending agreement to demolish the Highline to the review procedures set forth in the New York City Charter known as ULURP (NY City Charter §§ 197-c, 197-d). The petitioners include the New York City Council, Manhattan Borough President C. Virginia Fields, local community organizations and residents living in the vicinity of the Highline. Petitioners demand community input and ULURP review before the Highline is demolished. As an alternative to demolition, petitioners propose that the Highline be utilized as an elevated pedestrian park, a proposal that has garnered some support from local public officials.

The named respondents in this proceeding are the City of New York, former Mayor Rudolph W. Giuliani in his official capacity, and the New York City Department of Buildings (collectively, the City respondents). The intervenors-respondents are Chelsea Property Owners Association (CPO), a consortium of property owners whose properties abut the Highline, and Edison Mini-Storage Corp., one of the individual property owners. The respondents take the position that demolition of the Highline does not trigger ULURP review under City Charter § 197-c.

The Highline is an abandoned, elevated railway running along Manhattan's Lower West Side that currently extends from Gansevoort Street in the south to 34th Street in the north. It is 1.45 miles long, crosses over 22 city streets and passes through several buildings. The Highline was constructed in the 1920s and 1930s as part of a plan to eliminate dangerous railroad crossings at street level. As part of this plan, the City granted easements to the owner of the railroad, New York Central Lines (New York Central), to facilitate the construction of an elevated railway over City property. Currently, New York Central owns the Highline structure and easements, which encumber the properties owned by the City and 22 private entities. The Highline has not been used for freight rail service since 1982. Ac-

cording to respondents, the abandoned Highline has deteriorated to a point where it has become a danger to the community.

In 1999, the City commenced negotiations on a plan for the abandonment and demolition of the Highline. On December 20, 2001, the City, New York Central, the owners of the 22 parcels of private land burdened by the Highline and others executed an agreement titled "Agreement for Voluntary Abandonment and for Charitable Contribution" (Agreement). Under the Agreement, the parties would consent to the abandonment and demolition of the Highline, and New York Central would surrender the easements and the segments of the Highline structure to the 23 property owners whose properties had been so encumbered, including the City of New York.

Petitioners commenced the instant article 78 proceeding by the filing of a petition on November 29, 2001. The petition sought (1) a temporary restraining order (TRO) and a preliminary injunction preventing the demolition of the Highline pursuant to the Agreement; (2) an order directing the Department of Buildings to revoke certain permits for work in connection with the Highline; (3) an injunction barring respondents from applying for or approving any additional permits that would authorize the removal or alteration of the Highline; and (4) a declaration that respondents must submit any decision to remove the Highline to the ULURP process pursuant to City Charter § 197-c.

On December 19, 2001, the motion court issued a TRO barring the City from executing the Agreement. However, upon the City's application, this Court vacated the TRO and remanded for further proceedings.

By written decision dated March 12, 2002, the article 78 court granted the first and second causes of action in the petition to the extent of directing the City to submit the plan to demolish the Highline for review under ULURP, and staying any action by any party permitting or authorizing demolition of the Highline pending completion of the ULURP process.

The court found that ULURP review was required on two separate grounds. First, it concluded that the surrender of the easements from New York Central to the City pursuant to the Agreement constituted the acquisition of "real property" by the City, thereby triggering ULURP review under City Charter

§ 197-c (a) (11).[1] Second, it held that demolition of the Highline would require a change in the City Map, which also mandates ULURP review (City Charter § 197-c [a] [1]). The City respondents and intervenors-respondents both appeal from this determination.

■ On appeal, respondents argue that the motion court erred in finding that ULURP review was required. They contend that since neither the extinguishment of easements over City property nor the acquisition of railroad appurtenances constitutes the "[a]cquisition by the city of real property" within the meaning of City Charter § 197-c (a) (11), no ULURP review was required. Additionally, they argue that since the privately owned Highline has never been an official part of the City Map, which is reserved for public spaces, the demolition of the Highline does not trigger ULURP review as a change in the City Map (City Charter § 197-c [a] [1]). As we agree with both of these contentions, we reverse the order appealed and dismiss the petition.

*Acquisition of Real Property (City Charter § 197-c [a] [11])*

Under the City Charter, there must be ULURP review for any "[a]cquisition by the city of real property" (City Charter § 197-c [a] [11]). Although the parties cannot agree on the correct definition of "real property" under the City Charter,[2] the conflict is irrelevant in this instance because, under well-established principles of property law, there was no "acquisition" of property by the City.

As indicated, the Agreement calls for New York Central to surrender the easements relating to the Highline back to the 23 servient property owners, including the City, whose properties were encumbered by the Highline. However, since the City and the other property owners already owned the properties subject to the easements, they were not acquiring anything new. Rather, reacquiring the easements simply removed an encumbrance from their properties. "It is fundamental that where the title in fee to both the dominant and servient tenements become vested

---

1. Given this holding, the court found it unnecessary to consider whether the Highline structure itself constitutes "real property" within the meaning of City Charter § 197-c (a) (11).

2. Respondents note that the City Charter's general definition of "real property" does not include easements (City Charter § 1150 [12]). Petitioners, on the other hand, argue that City Charter § 210 (8), pertaining to capital projects and budget, includes easements within the definition of "real property."

in one person, an easement is extinguished [by merger]" (*Alfassa v Herskowitz*, 239 AD2d 307, 308 [1997], quoting *Castle Assoc. v Schwartz*, 63 AD2d 481, 486 [1978]). Because the process of merger represents the extinction, not the conveyance, of an interest in real estate, no acquisition of real property was contemplated by the Agreement.

The motion court's contrary conclusion that an "easement must be acquired before it is merged" misapprehends the unique nature of an easement and the merger process. (2002 NY Slip Op 40062[U], *10.) Indeed, the Court of Appeals has held that "[t]he merger doctrine proceeds from a recognition that a person cannot have an easement in his or her own land because all the uses of an easement are fully comprehended in the general right of ownership (*Beekwill Realty Corp. v City of New York*, 254 NY 423, 426; 2 Warren's Weed, New York Real Property, Easements, § 3.03 [4th ed])" (*Will v Gates*, 89 NY2d 778, 784 [1997]). Thus, when a servient owner reacquires an easement from the dominant owner, the merger process is automatic and the easement is immediately extinguished.

The motion court's reliance on the language in the Agreement stating that the easements will be "conveyed" to all owners of servient properties is misplaced. The use of the term "convey" does not vest the servient property owner with a possessory interest in the easement, since, under the merger process, that interest is automatically extinguished upon its return to the servient owner. The term "convey" merely describes the process of retransferring the easement back to the servient property owners as part of the merger process. Irrespective of whether this transfer is labeled a "conveyance," an "acquisition" or a "surrender," fundamental tenets of property law compel the conclusion that a servient owner can never possess an easement independent of the process of merger.

Petitioners' additional argument that the transfer of the Highline structure itself constitutes an acquisition of real property by the City is equally unpersuasive. Petitioners again rely on the definition of "real property" found in City Charter § 210 (8), which includes "all lands and improvements." They argue that since the Court of Appeals has previously defined "improvements" to include "[b]uildings and other articles and structures, substructures and superstructures erected upon, under or above the land, or affixed thereto, including *bridges*" (*Matter of Consolidated Edison Co. v City of New York*, 44 NY2d 536, 541 [1978] [emphasis added], quoting RPTL 102 [12] [b]), then the

Highline structure, portions of which resemble a bridge, constitutes real property under the City Charter. We disagree.

Petitioners' reliance on the definition of "real property" in City Charter § 210 (8) is misplaced. Although section 210 does state that the definition of "real property" is applicable to "this [C]harter," it cannot be ignored that this definition is found within chapter 9, which deals with capital projects and budget. Petitioners have made no showing that chapter 9 is applicable here. Respondents, on the other hand, point to chapter 52, which includes the "General Provisions" of the City Charter, and more specifically to section 1150 (12), which defines "real property" more narrowly as including "real estate, lands, tenements and hereditaments, corporeal or incorporeal." We agree with respondents that for purposes of ULURP, the general definition of "real property" in section 1150 (12) is applicable, and it does not include improvements.

*Matter of Consolidated Edison Co. v City of New York* (44 NY2d 536 [1978]) and other cases cited by petitioners for the proposition that railroad structures and bridges are "real property" for purposes of ULURP are inapposite. Each of these cases relied on a definition of "land" or "real property" found in a New York State tax law provision as a basis for concluding that railroad bridges or structures constitute land or real property for tax assessment purposes (*see e.g. Matter of Consolidated Edison Co. v City of New York*, 44 NY2d 536 [1978] [applying definition of "real property" in RPTL 102 (12) (b)]; *People ex rel. Lehigh Val. Ry. Co. v Woodworth*, 296 NY 288 [1947] [applying definition of "real estate" or "real property" in Tax Law § 2 (6) (now RPTL 102 [12] [b])]). As this is not a tax case and the City Charter § 1150 definition of "real property" governs, these cases are not relevant.

In addition, respondents cite numerous cases from other jurisdictions, including one from the United States Supreme Court, which hold that railroad structures and appurtenances placed upon the land of another pursuant to an easement are personalty, not realty, absent a showing that such structures were intended to be merged with the realty (*see e.g. Wiggins Ferry Co. v Ohio & M. Ry. Co.*, 142 US 396, 415 [1892] [tracks belong to railroad because they were laid under an easement with no intention of becoming part of realty]; *Matter of Boston & Maine Corp.*, 596 F2d 2, 8 [1st Cir 1979] [applying "general rule" that tracks and other structures are trade fixtures not intended to become part of realty]; *American Steel & Iron Co. v*

*Taft*, 109 Vt 469, 472, 199 A 261, 262 [1938] [tracks, railroad structures and other equipment do not become part of realty and may be removed by railroad upon abandonment of right of way]). Petitioners have failed to show that this prevailing rule should not be applied here, and therefore, we hold that the Highline structure is personalty, not realty, for purposes of ULURP.

*Changes in the City Map (City Charter § 197-c [a] [1])*

■ ULURP review is also required where any applications respecting the use of real property would effect "[c]hanges in the city map" (City Charter § 197-c [a] [1]; *see also* City Charter § 199). It is undisputed that the City Map is not a single document. Rather, it is a collection of maps, apparently numbering in the thousands, that record spaces such as parks, playgrounds, streets, bridges and tunnels for official purposes. Under the City Charter, the agency entrusted with the responsibility for maintaining the City Map is the New York City Department of City Planning (City Charter § 198 [b]). City Charter § 198 (b) states: "The director of city planning shall be the custodian of the city map, and it shall be his or her duty to complete and maintain the same and to register thereon all changes resulting from action authorized by law."

Although the parties do not agree on the proper scope of the City Map's contents, the Administrative Code of the City of New York (Administrative Code) does speak directly on the subject. Section 25-102 of the Administrative Code, which is titled "City map; what to include," provides:

> "There shall be located and laid out on the city map all parks, playgrounds, streets, courtyards abutting streets, bridges, tunnels and approaches to bridges and tunnels, and improvements of navigation in accordance with bulkhead and pierhead lines . . . . The width and grades of all streets so located and laid out shall be indicated thereon."

Respondents argue that since Administrative Code § 25-102 specifically mandates the items that must be included on the City Map, and private easements are *not* included on that list, private easements, such as the 23 easements comprising the Highline, are excluded from the City Map as a matter of law. They note that the items listed in Administrative Code § 25-102 are exclusively public spaces. In addition, the City's expert, a supervisor in the City Planning Department, unequivocally states that "[o]nly public spaces are listed on the city map for

official purposes" and that "private railroads and property interests associated therewith are not components of the City Map." The City's expert further averred that the City Charter provision in effect at the time the Highline was constructed also listed only public spaces as items properly includable on the City Map (*see* former Greater New York Charter § 442 [1917]).[3]

Petitioners counter that by passing the New York City Grade Crossing Elimination Act in 1928 (L 1928, ch 677 [hereinafter 1928 Act]), the State Legislature mandated that the Highline be "deemed" part of the City Map. They further contend that since the Highline was made part of the City Map in 1928, and has never been specifically removed, the proposed demolition of the Highline would necessarily result in a change in the City Map, thereby triggering ULURP review.

In light of the fact that Administrative Code § 25-102 and former Charter § 442 appear to support respondents' argument that the City Map records only public spaces for official purposes, we must examine in greater detail petitioners' contention that the 1928 Act created an exception to this general rule. The grade crossing changes mandated by the 1928 Act were part of what was known as the "Enlarged Plan." In order to facilitate these changes, the 1928 Act included section 5 (5), a provision designed to expedite the plan's approval by municipal authorities (mapping provision). The mapping provision states in relevant part:

> "[u]pon entry of any order by the [transit] commission approving the agreement [implementing the Enlarged Plan], *any change in the location of the railroad shown upon the enlarged plan,* and any change in the lines or grades or both of any street, avenue, marginal way, public wharf, park or place shown upon the enlarged plan, *shall be deemed to be duly authorized and the map or plan of the city shall be deemed to have been changed accordingly without any further action or proceeding on the part of the city or such railroad corporation*" (emphasis added).

The article 78 court interpreted this provision to mean that "the legislature directed the filing of the [Enlarged] Plan to be

---

**3.** Section 442 authorized changes in the "map or plan of the city of New York" to include "new streets, parks, playgrounds, bridges, tunnels and approaches to bridges and tunnels and parks and playgrounds, and to widen, straighten, extend, alter and close existing streets and courtyards abutting streets, and to change the grade of existing streets shown upon such map or plan; also to lay out improvements of navigation."

a part of the City Map," and that "[a]bsent some indisputable legal authority supporting removal [of] the Plan from inclusion in the City Map, the Plan remains a part of the Map." (2002 NY Slip Op 40062[U], *13, 14.)

Similarly, petitioners argue that pursuant to the mapping provision, "[t]he New York State Legislature officially amended the City Map to include the Highline," since the City Map was "deemed to have been changed" to reflect "any change in the location of the railroad." In support of their interpretation, petitioners submitted a series of engineering maps titled "Plans and Profiles,"[4] which petitioners contend were made part of the City Map by the 1928 Act, and which clearly depict the Highline.

Petitioners also submitted an affidavit of Anthony Gulotta, a licensed professional engineer with 32 years of experience working with the New York City Department of Transportation, the Manhattan Borough President's office and as a private mapping consultant in connection with changes to the City Map. Gulotta states that the Plans and Profiles attached to the petition are unquestionably part of the City Map, and the language of the 1928 Act "leaves no room for doubt" that the Enlarged Plan was made part of the City Map by legislative direction.

Gulotta further states that the Highline was properly placed on the City Map since "the High Line and the entire Enlarged Plan was a public improvement, which went through a public process, served a public purpose, and used public funds." Gulotta rejects the City's position that private easements are not the proper subject of the City Map, asserting that "[q]uestions relating to ownership, including the ownership of specific easements, are not relevant when discussing the City Map." The City Map, he asserts, is not concerned with ownership, but only with planning and the use of space. In addition, Gulotta argues that the Highline is properly found on the City Map since it is a "bridge," which is one of the items listed in Administrative Code § 25-102.

Respondents, on the other hand, argue that the petitioners and the motion court have misinterpreted the 1928 Act as officially incorporating the entire Enlarged Plan, including its nonpublic components such as the Highline, onto the City Map,

---

**4.** The full title of the plans is: "Plans and Profiles—Prepared Pursuant to Chapter 677 of the Laws of 1928, as Amended, for the Alteration of the Highway Railroad Grade Crossings of the New York Central Railroad Company on the Westerly Side of Manhattan" (hereinafter Plans and Profiles).

when in fact it did no such thing. Respondents also relied heavily on the affidavit of their expert, Robert Gochfeld, a supervisor in the Technical Review Division of the New York City Department of City Planning. Gochfeld's responsibilities for the past 15 years have included "supervising the review and processing of applications for modifications of the City Map" submitted to the City Planning Department.

Gochfeld asserts that, consistent with the list of items found in Administrative Code § 25-102 and former Charter § 442, "the City Map functions as an official document whose purpose is to record the creation, modification and alteration of *public spaces*, including the City's streets, parks, and bridges" (emphasis in original). The City Map, according to Gochfeld, "does *not* show private easements" (emphasis in original), as it would be "inconsistent with the purpose of the City Map to do so." He further states that apart from the official entries of public spaces, the City Map also includes entries intended to be used for "informational purposes" only, which allow users of the maps to orient themselves. Such entries include references to natural resources such as the Hudson and East Rivers as well as certain prominent buildings and structures.

Gochfeld's essential argument is that the 1928 Act must be read consistently with the recognized contents of the City Map under Administrative Code § 25-102 (and former Charter § 442)—i.e., that it only includes public spaces. According to him, the mapping provision makes two separate statements: (1) that certain changes shown upon the Enlarged Plan (including any change in the location of the railroad) shall be deemed authorized; and (2) that the map or plan of the City shall be deemed to have been changed to reflect certain map-related items described in the Enlarged Plan. Thus, according to Gochfeld, the mapping provision "does not state that the Highline railroad easement shown on the enlarged plan is to be placed on the City Map; rather, it provides only that, to the extent implementation of the enlarged plan requires changes to entries *normally* found on the City Map, these changes are deemed to have been made" (emphasis added). Gochfeld concludes that the purpose of the mapping provision was to "facilitate those changes to the City Map made necessary by the Act, and not to take the unprecedented step of placing private railway easements on the City Map for official purposes."

After careful review of the parties' expert affidavits and appellate briefs, we find respondents' arguments more persuasive

for several reasons. First, it would seem obvious the best evidence of what is the proper subject of the City Map is the statute governing the City Map's contents, namely, Administrative Code § 25-102. It cannot be disputed that the items listed in section 25-102 ("all parks, playgrounds, streets, courtyards abutting streets, bridges, tunnels and approaches to bridges and tunnels") are public spaces and that private railroad structures or easements are not included on that list.

Accordingly, pursuant to the statutory construction rule expressio unius est exclusio alterius, "where a law expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not excluded was intended to be omitted and excluded" (McKinney's Cons Laws of NY, Book 1, Statutes § 240, at 411-412, citing *Doyle v Gordon*, 158 NYS2d 248 [1954]). Here, the text of Administrative Code § 25-102 (and former Charter § 442) provides an "irrefutable inference" that private easements are not the proper subject of the City Map.

Nor are we persuaded by petitioners' argument that the multiple segments of Highline structure constitute a "bridge" within the meaning of Administrative Code § 25-102. Petitioners offer no support for their claim that privately owned, elevated railroad viaducts were intended to be included within the Administrative Code's definition of "bridge," a term commonly understood to refer to publicly owned structures utilized as public thoroughfares. Moreover, had City officials intended that railroad viaducts or bridges be considered part of the City Map, it would have been easy for the drafters of Administrative Code § 25-102 to accomplish this result.

Second, we find that the motion court erred in dismissing Gochfeld's opinions on the official contents of the City Map as mere "lay views." (2002 NY Slip Op 40062[U], *14.) Given Gochfeld's employment at the City Planning Department for over 25 years, his intimate knowledge of the operational practices of that Department and the nature of his duties "supervising the review and processing of applications for modifications of the City Map," in our view, he is uniquely qualified to render an opinion on the proper subjects of the City Map.

Although the proper interpretation of a statute ordinarily presents an issue of law for the courts, "[a]n administrative agency's interpretation of the statute it is charged with implementing is entitled to varying degrees of judicial deference depending upon the extent to which the interpretation relies

upon the special competence the agency is presumed to have developed in its administration of the statute" (*Matter of Gruber*, 89 NY2d 225, 231 [1996]). Where the question is one of "pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency" (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980]), and no deference is required. However, where the statutory language suffers from some "fundamental ambiguity" (*Matter of Golf v New York State Dept. of Social Servs.*, 91 NY2d 656, 667 [1998]; *Matter of Beekman Hill Assn. v Chin*, 274 AD2d 161, 167 [2000], *lv denied* 95 NY2d 767 [2000]), or "the interpretation of a statute or its application involves knowledge and understanding of underlying operational practices" (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980]), courts routinely defer to the agency's construction of a statute it administers.

We believe that Gochfeld's opinion concerning what impact, if any, the 1928 Act had on the City Map's content was deserving of some degree of judicial deference because the language of the mapping provision was fundamentally ambiguous and susceptible of conflicting interpretations (*see Matter of Golf v New York State Dept. of Social Servs.*, 91 NY2d 656, 667 [1998]; *Matter of Beekman Hill Assn. v Chin*, 274 AD2d 161, 167 [2000]). For instance, while petitioners and their expert steadfastly assert that the 1928 Act made the Plans and Profiles part of the City Map in their entirety, Gochfeld categorically rejected this claim. To confirm his position, Gochfeld noted that the Plans and Profiles depict numerous privately owned structures and properties including rail yards, driveways, warehouses and markets. Since even petitioners do not suggest that these private structures are on the City Map, or that their alteration would require ULURP review, their assertion that the entirety of the Plans and Profiles (including the Highline) was incorporated onto the City Map is significantly undermined.

Deference was also appropriate since many of Gochfeld's opinions related to his peculiar "knowledge and understanding of underlying operational practices" of the City Planning Department (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d at 459). Indeed, to the extent that the official City Map depicts certain private structures or properties, such facts are entirely consistent with Gochfeld's explanation that while the City Map officially records only public spaces, certain private interests

and natural landmarks are included as references on the City Map for "informational purposes" only. As Gochfeld is currently charged with the day-to-day responsibility of processing changes to the City Map, his view of what the City Map properly contains must be considered highly persuasive.

A third reason respondents should prevail is that their interpretation of the mapping provision is most consistent with the undisputed legislative intent of the 1928 Act (*see Matter of Sutka v Conners*, 73 NY2d 395, 403 [1989] [in matters of statutory interpretation, legislative intent is the "great and controlling principle"]; *Matter of City of New York v State of New York*, 282 AD2d 134, 141-142 [2001], *affd* 98 NY2d 740 [2002]). As the title of the 1928 Act suggests, the underlying goal of the "New York City Grade Crossing Elimination Act" was to eliminate dangerous rail crossings at grade (i.e., street level) that posed a serious public health risk in urban areas (*see Transit Commn. v Long Is. RR. Co.*, 253 NY 345 [1930]). Because the 1928 Act itself imposed public notice and hearing requirements before the Enlarged Plan could be approved, the mapping provision was designed to obviate any further local review process, such as that required for changes to the City Map, that could delay the elimination of these hazards. Thus, the mapping provision expedited the removal of grade crossings by deeming any changes to the City Map required by the Act as automatically made. Thus, insofar as the intent of the mapping provision was to accelerate the elimination of a public health hazard, and was not intended to expand or redefine the contents of the City Map, we adopt respondents' conclusion that the 1928 Act did not make the Highline an official part of the City Map. Moreover, had the Legislature truly intended that a single private railroad easement and elevated rail structure become part of the City Map, which had traditionally been reserved for exclusively public spaces, it surely would have included clear language to that effect (*see Hudson Deepwater Dev. v City of Troy*, 299 AD2d 801, 803 [2002]).

Lastly, we believe that petitioners' interpretation, if adopted, would lead to several incongruous results. A finding that the Highline is part of the City Map would call into question the accuracy of the description of the contents of the City Map in Administrative Code § 25-102, which does not include elevated railroad structures or private interests. In addition, petitioners' construction would broaden the scope of ULURP beyond the intent of the City legislative body since actions relating to

private land interests not "subject to city regulation" (City Charter § 197-c [a]) fall outside the scope of ULURP. In our view, interpreting ULURP in such a manner, based on an interpretation of an ambiguous statute passed in 1928 for a purpose completely unrelated to ULURP, would alter ULURP in a manner not envisioned by the Legislature.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Diane Lebedeff, J.), entered April 30, 2002, which granted petitioners' first and second causes of action to the extent of directing that ULURP review proceed and enjoining any action by respondents permitting or authorizing demolition of the elevated railway known as the Highline, should be reversed, on the law, without costs, the application denied and the petition dismissed.

BUCKLEY, P.J., SULLIVAN and FRIEDMAN, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered April 30, 2002, reversed, on the law, without costs, the application denied and the petition dismissed.