OPINION OF THE COURT
Chief Judge Kaye.
Shortly before dawn during August 1983, defendant Andre Robertson, while driving on the Henry Hudson Parkway near 72nd Street in the City of New York, failed to negotiate a curve and drove his car into two highway barriers. The car flipped over, rendering plaintiff, a passenger in the car, a paraplegic.
Plaintiff brought this action against Robertson and the City alleging that Robertson negligently operated the car and the City negligently failed to post proper warning signs. The City resisted liability on several grounds, among them that responsibility for proper signage rested solely with the State. Summary judgment for the City was denied, and after trial, a verdict was returned against both defendants, apportioning liability 67% against the City and 33% against Robertson. The Appellate Division reversed and remanded for a new trial as to damages only, unless plaintiff stipulated to a reduced damages award. Plaintiff so stipulated and an amended judgment was entered. We agree that the City’s claimed lack of responsibility was correctly rejected, and accordingly affirm that judgment.
Viewing the evidence in a light most favorable to plaintiff, Robertson was driving southbound in the right-most lane at night on a road that was unfamiliar to him, at a speed in excess of posted limits. At the accident site, the Parkway makes a "reverse-S” curve and turns into the elevated West Side Highway. Because of the location of lightposts on the *86 "reverse-S” curve, in the dark the road appears to be a continuous straightaway. A diamond-shaped yellow "reverses’’ warning sign and a 35 mile speed limit sign are posted just at the beginning of the curve. Robertson did not see the warning signs until he was at the mouth of the curve, when it was too late.
The evidence established that the City developed and implemented the sign placement plan for the Parkway. From 1970 forward, the City plan called for a diamond-shaped "reverses’’ yellow warning sign to be placed at post H-9, about 300 feet before the curve involved in the accident. A 1977 revision of that plan called for a speed limit of 35 miles per hour to be posted at the same place. Unfortunately, in 1978, City employees mistakenly placed the signs at post H-6 — 300 feet further south, at the start of the curve — where the signs remained on the date of the accident.
The City did not dispute its awareness that the curve was a hazardous location that had been the site of other single car accidents for several years before the accident. The City, however, argues that it can have no liability because the Henry Hudson Parkway is owned by the State as part of the State arterial highway system. We disagree.
As a State arterial highway — meaning a highway running through a locality and connecting it to State highways — the Henry Hudson Parkway by definition involves both the State and the locality.
Determination of the City’s responsibility for that roadway must begin with article XII-B of the Highway Law (Highway Law §§ 349-b through 349-f). That article was enacted in 1944 (L 1944, ch 543) to create a State-wide system for the use of State and Federal funds in the construction and modernization of State arterial highways (see, Highway Law § 349-b).
Under article XII-B, the State is empowered to expend State or Federal funds for the purchase, design, construction or reconstruction of arterial routes running through cities (Highway Law § 349-c [1], [5], [6]), and thereby attains ownership of such roads (Highway Law § 349-d). Once State construction or reconstruction of an arterial highway is complete, however, the State must return "jurisdiction” of the roadway to the City (Highway Law § 349-c [3.4]). Notwithstanding such return of jurisdiction article XII-B contemplates that the State *87 retains continuing maintenance responsibility for State arterial highways it has constructed or reconstructed (Highway Law § 349-c [7]-[9]).
The trial evidence showed that the State had attained ownership of the Henry Hudson Parkway due to a reconstruction under article XII-B. Moreover, effective 1978, the State had transferred jurisdiction to the City with the direction that such transfer "shall not operate in derogation of the State’s right to establish and require compliance with maintenance standard[s] and also require compliance with any Federal Highway Administration order, directive rule or regulation concerning Federal-aid Highways.” Thus, as of the date of the accident, the City had jurisdiction over the Henry Hudson Parkway but the State retained certain maintenance responsibilities. These responsibilities — as allowed by Highway Law § 349-c (7)-(9) — were delegated to the City under an ongoing maintenance agreement. Under the maintenance agreement, the State reserved the right to perform its own sign installation and replacement, with the City to maintain any signs installed by the State.
Article XII-B, however, did not relieve the City of its obligation to keep the Henry Hudson Parkway — a highway within its jurisdiction — safe (see, Weiss v Fote, 7 NY2d 579, 584). To the contrary, according to the statutory Declaration of Policy: "it is the manifest intention of the state to recognize and to preserve the powers or rights heretofore conferred upon or delegated to any city to regulate the property, affairs or government thereof, in the modernization and the construction of such arterial highways” (Highway Law § 349-b). During the drafting of article XII-B, concern was expressed that the law would prevent New York City from acting over its own streets and "proceeding with * * * design or acquisition even with its own money” (Letter from Mayor La Guardia to Governor Dewey, dated Mar. 23, 1944, recommending disapproval of A Int 2052, Pr 2428, in Bill Jacket for L 1944, ch 543). In response, the memorandum filed with the bills stated "[t]hese bills meticulously avoid unnecessary infringement upon the local government and local responsibility for local affairs” (Governor’s Approval Mem, dated Apr. 1944, filed with A Int 2052, Pr 2428; S Int 13, Pr 1994, in Bill Jacket for L 1944, ch 543). As enacted, the statute explicitly reserves to the City the right to make its own plans, acquire its own property, perform its own construction, and otherwise control arterial highways within City limits (see, Highway Law § 349-c [3.1]-[3.4], [3.6]).
*88 Recognition of City responsibility is a theme sounded throughout the legislative history of amendments to article XII-B (see, e.g., Mem in Opposition to S 6939 from Legis Rep R. Brown, in Bill Jacket for L 1971, ch 617 ["(s)ince the inception in this state of the Federal-aid highway program, the City has had a concurrent power over state highway construction in the City of New York and has exercised this power in the City’s interest”]; Letter from R. Moses, City of NY Planning Commn, dated Feb. 21, 1945, in Bill Jacket for L 1945, ch 619 [discussing arrangements to retain "genuine autonomy” for the City of New York in the matter of State arterial highways]). Thus, the City’s argument — that it could not be liable here because the placement of signs on the Parkway was solely a State responsibility — is wholly without basis.
Indeed, the City acknowledges that, as contemplated by the statute, it actually planned where new signs should be placed on the Parkway and then placed those signs. Once a municipality undertakes a duty, it must of course perform that duty in a nonnegligent manner (Florence v Goldberg, 44 NY2d 189, 196; Wolf v City of New York, 39 NY2d 568, 573; Moch Co. v Rensselaer Water Co., 247 NY 160, 167 [the "hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all”]). There is no dispute that negligent placement of the signs perpetuated a dangerous traffic condition, and the jury reasonably found that such condition was a proximate cause of plaintiff’s injury. Thus, there was no error in allowing liability against the City.
Thompson v City of New York (78 NY2d 682, 684-685) is not to the contrary. There we restated the rule that a municipality has a duty to maintain its streets in a reasonably safe condition and that the municipality breaches such duty if it permits a dangerous or potentially dangerous condition to exist and cause injury (id., at 684-685). However, we reversed the judgment against the City because plaintiff there had failed to show that the City had rendered a safe situation dangerous by neglecting to replace a bulb in a streetlight (id., at 685). Here, by contrast, the road condition was hazardous from the outset and the City undertook to make it safe. In failing to do so, the City perpetuated the dangerous condition, and cannot now escape liability by disavowing responsibility for placing signs on the Parkway.
*89 Finally, there is no merit in the City’s contention that the sign placement was irrelevant to liability because defendant Robertson’s speeding was the sole cause of the accident. Proximate cause is a jury question (Derdiarian v Felix Contr. Corp, 51 NY2d 308, 315), and we see no reason to disturb the jury’s determination that the negligence of both the City and Robertson contributed to the accident. We also reject the City’s request to reduce or eliminate the award for economic loss, as we cannot say those damages — already reduced by the Appellate Division — are without sufficient support in the record.
Accordingly, the judgment appealed from and order of the Appellate Division brought up for review should be affirmed, with costs.
Judges Simons, Titone, Hancock, Jr., and Bellacosa concur; Judge Smith taking no part.
Judgment appealed from and order of the Appellate Division brought up for review affirmed, with costs.