[677 NYS2d 119]

LEONARD J. GREGORIO, Public Administrator of Westchester County, as Administrator of the Estate of PAWEL A. FRUBA, Deceased, Plaintiff, v CITY OF NEW YORK et al., Defendants.

STANISLAW STARCZEWSKI, Individually and as Administrator of the Estate of IWONA STARCZEWSKI, Deceased, Appellant, v CITY OF NEW YORK, Respondent.

PUBLIC ADMINISTRATOR OF THE COUNTY OF WESTCHESTER, as Administrator of the Estate of JOLANTA E. GLOWACZ, Deceased, Appellant, v CITY OF NEW YORK, Respondent. (And Another Action.)

First Department, August 20, 1998

### APPEARANCES OF COUNSEL

*Harry Steinberg* of counsel, New York City (*Brian J. Shoot* on the brief; *Schneider, Kleinick, Weitz, Damashek & Shoot,* attorneys), for appellants.

*Ellen B. Fishman* of counsel (*Leonard Koerner* on the brief; *Jeffrey D. Friedlander, Acting Corporation Counsel* of New York City, attorney), for respondents.

### OPINION OF THE COURT

MILONAS, J. P.

These consolidated wrongful death and personal injury actions arise out of a July 1987 accident on a viaduct section of the Bronx River Parkway. Defendant Claudio Robles was driving south when his car crashed into the rear of another car. Robles lost control of his vehicle, which hit the concrete median barrier separating southbound from northbound traffic, crossed the median and struck an oncoming car, killing the driver (Pawel Fruba) and two passengers (Iwona Starczewski and Jolanta Glowacz) and seriously injuring a third, plaintiff Stanislaw Starczewski. These actions were commenced against Robles and the City, and, based upon trial evidence establishing that Robles was intoxicated at the time of the accident, and that he had been arrested and pleaded guilty to vehicular manslaughter, the court directed a verdict as against him.

As to the City, plaintiffs claimed that it was at least jointly responsible with the State for the safety of the Parkway, which was part of the State arterial highway system, and that the viaduct was unsafe because the barrier, by its very design, actu-

ally enabled Robles's car to cross over into the path of oncoming traffic, rather than preventing such occurrence; a safer median (the Jersey barrier) had long been available, was commonly used and prevented crossover accidents due to its height and shape. According to plaintiffs, the City was the owner of the Parkway, with authority to design, construct, repair and maintain it, but it had negligently failed to do so in accordance with the standards of good highway engineering, permitting a defective and dangerous median to exist for an extended period of time. Plaintiffs claimed that this failure to upgrade the barrier using permanent or temporary measures, or to otherwise reduce the risk of crossover accidents, resulted in the deaths and injuries here.

The City disclaimed responsibility for replacing the barrier because the Parkway had been constructed by the State, and the City had only limited responsibility for its maintenance pursuant to a contract with the State, which did not include making capital expenditures for such improvements. The City also raised the defense of qualified governmental immunity.

Prior to the commencement of trial, the City asked the court to conduct an evidentiary hearing outside the presence of the jury on the issue of the City's responsibility for the Parkway and any duty it owed to plaintiffs, as well as the issue of governmental immunity. The court initially declined to conduct such hearing, but decided to proceed in this fashion after plaintiffs presented their case and the City began its defense.

After hearing testimony from experts and employees of the State and City Departments of Transportation (DOT) regarding the construction, history, maintenance and condition of the Parkway and the hazards of the existing barrier, the court concluded in a written decision that, while the City had a duty to maintain the Parkway in a reasonably safe condition, the State, not the City, was obligated to undertake the capital expenditure of replacing the barriers; that the condition and accident history of the viaduct did not create an obligation on the part of the City to take immediate action; and that it had a defense of qualified governmental immunity. Thus, the court held that the City could not be found liable, and the court granted its motion for a directed verdict, dismissing all claims as against it.

The relevant evidence before the court may be summarized as follows. State construction of the Parkway was completed in 1962, with the barriers in place since at least that time. Three crossover accidents had occurred, in April 1984, May 1985 and

September 1985, all involving southbound to northbound crossovers like the instant one, but none had caused any fatalities. The need to correct deficiencies on the Parkway, including barrier replacement on the viaduct, was raised on more than one occasion in 1984 and 1985 at meetings between the State and City DOTs, and both were aware of studies in the 1970's finding the Parkway median to be unsafe and nonstandard. For reasons including funding priorities, viaduct barriers were not replaced, but the Jersey barrier was installed elsewhere on the Parkway.

According to an engineer who had worked for the City DOT, any other standard barrier would have prevented the crossover accident, while the existing barrier actually "launched" vehicles by allowing the tires to ride up and vault over it. There were several alternatives that prevented or reduced the risk of such crossover accidents. Following the instant accident, the highway safety officer assigned to the area recommended that the City DOT authorize emergency installation of a specific temporary measure to prevent such accidents until a Jersey barrier could be installed. According to a City DOT commissioner, the City performed only maintenance work expressly authorized under the State's maintenance contract; it was not responsible for capital projects such as replacing median barriers, and, were it to undertake such a capital improvement, it would require State approval and funding. According to a City engineer, the City had replaced guardrails and median barriers on roadways with or without State permission, and it had replaced wooden guardrails on the sides of the Bronx River Parkway with safer W-beam guardrails.

We find that, based on the evidence, it was error to direct a verdict for the City and dismiss the complaint as against it. A municipality has a nondelegable duty to the public to keep its streets and highways in reasonably safe condition (*Friedman v State of New York*, 67 NY2d 271, 283; *Ames v City of New York*, 177 AD2d 528, 531), and this duty includes providing and maintaining adequate barriers (*Gomez v New York State Thruway Auth.*, 73 NY2d 724, 725). At the same time, a municipality enjoys qualified immunity from "liability arising out of a highway planning decision which arises out of a concern for unwarranted intrusion into discretionary governmental functions" (*Ames v City of New York, supra*, at 531; *Friedman v State of New York, supra*; *Weiss v Fote*, 7 NY2d 579). A municipality may be liable, however, where the study conducted was "plainly inadequate" or the plan adopted lacked

any "reasonable basis" (*Friedman v State of New York, supra,* at 284). Here, the court erred in its findings as to the City's responsibility and its defense of qualified immunity.

First, we agree with plaintiffs' contention that, under *Nowlin v City of New York* (81 NY2d 81), the City is jointly responsible with the State for the safety of this arterial highway. Highway Law article XII-B, "State Arterial Highways Passing Through Cities," permits the State to use its own or Federal funds for the "purchase, design, construction or reconstruction of arterial routes running through cities," which action confers ownership of such roads on the State (*Nowlin v City of New York,* 81 NY2d 81, 86, *supra).* Upon completion of the work, "the State must return 'jurisdiction' of the roadway to the City (Highway Law § 349-c [3.4])" (*supra,* at 86). In *Nowlin,* the City disclaimed liability for an accident on the Henry Hudson Parkway because it was owned by the State as part of the arterial highway system. In rejecting this argument, the *Nowlin* decision explains and disposes of the issue herein.

"Article XII-B, however, did not relieve the City of its obligation to keep the Henry Hudson Parkway—a highway within its jurisdiction—safe (*see, Weiss v Fote,* 7 NY2d 579, 584). To the contrary, according to the statutory Declaration of Policy: 'it is the manifest intention of the state to recognize and to preserve the powers or rights heretofore conferred upon or delegated to any city to regulate the property, affairs or government thereof, in the modernization and the construction of such arterial highways' (Highway Law § 349-b). During the drafting of article XII-B, concern was expressed that the law would prevent New York City from acting over its own streets and 'proceeding with * * * design or acquisition even with its own money' (Letter from Mayor La Guardia to Governor Dewey, dated Mar. 23, 1944, recommending disapproval of [the bill]). In response, the memorandum filed with the bills stated '[t]hese bills meticulously avoid unnecessary infringement upon the local government and local responsibility for local affairs' (Governor's Approval Mem, dated Apr. 1944 * * *). As enacted, the statute explicitly reserves to the City the right to make its own plans, acquire its own property, *perform its own construction,* and otherwise control arterial highways within City limits (*see,* Highway Law § 349-c [3.1]-[3.4], [3.6])." (*Supra,* at 87 [emphasis added].) The court here distinguished *Nowlin* because it did not involve the failure to act but rather the City's affirmative conduct in undertaking a task (placement of signs) and performing it negligently, but we find the distinc-

tion to be without significance. Having set forth the statutory history, the Court of Appeals concluded that the City's argument—that it could not be held liable because the placement of signs was *solely* a State responsibility—was "wholly without basis" (*supra,* at 88). We also disagree with the City's argument that responsibility for a roadway is affected by when or how it comes into the arterial highway system, because the broad language of *Nowlin* and the statutory history it recites suggest otherwise.

Second, we disagree with the court's conclusion that the prior accident history did not justify emergency measures on the part of the City to remedy a dangerous condition, particularly in light of the City's long-standing knowledge that the barriers were unsafe and alternatives of varying costs existed that reduced or eliminated the risk of crossover accidents. Thus, in this respect, we find the City is not entitled to the defense of qualified immunity. Although the previous accidents did not result in fatalities, and three accidents do not constitute a "proliferation" such as in *Ames v City of New York* (*supra,* at 531), there is no quota or cutoff that must be met before liability may be imposed. In the *Friedman* case, where the Court of Appeals rejected plaintiffs' claim that a 10-year delay in replacing barriers was inexcusable given highway design development, it stated that the claim might be viewed differently "if urged with respect to an accident" during that period (67 NY2d, *supra,* at 285). If a single accident over a 10-year period may impact on governmental responsibility (*but see, Patti v State of New York,* 217 AD2d 882, 883), then the history of three prior accidents here over an 18-month period, all involving vehicles travelling in the same direction and on the same portion of the viaduct as the Robles vehicle, along with the long-standing knowledge that the barrier was unsafe, raises an issue of fact as to whether the City was obligated to take some step to remedy a dangerous condition.

Notably, in *Ames (supra),* where the City denied responsibility for the failure to install a Jersey barrier on an arterial highway (which, as here, would have prevented the accident), it claimed not only that fiscal restraints prevented undertaking such a project, although it had installed the Jersey barrier elsewhere on the highway, but also that it was waiting for the State to undertake the project. The Second Department rejected the defense of qualified immunity because of an unjustifiable nine-year delay in remedying a known hazardous condition, as well as the City's claim that because of the

designation of the roadway as a State arterial highway, "it was released from its obligation to provide safe highways for its citizens" (177 AD2d, *supra,* at 533). Under Highway Law § 349-c (3.1)-(3.4) and (3.6), the City still had the right to control arterial highways within its borders and to perform its own construction. Even a three-year delay in formulating a plan to replace barriers known to be hazardous may defeat a municipality's qualified immunity defense (*Giske v State of New York,* 191 AD2d 675, 676-677).

In connection with the City's attempt to excuse its failure here to act with respect to the barriers due to funding priorities, we note that, in contrast to *Edouard v Bonner* (224 AD2d 575, 577, *lv denied* 88 NY2d 811), where the City made a sufficient showing at trial that it had legitimately prioritized its safety projects, the court here recognized in its decision that "there [was] a paucity of evidence as to any planning, ordering of priorities, or any limitation of available funding." Accordingly, we find there is a question of fact for a jury as to whether, at the time of this accident in 1987, the City's failure to take any action to eliminate or reduce the risk of crossover accidents (e.g., by reducing the number of lanes of traffic flowing in each direction) rendered it liable for plaintiffs' injuries.

To the extent that we do not follow two prior memorandum decisions of this Department cited by the City to support its claim of maintenance responsibility only (*Nunez v City of New York,* 177 AD2d 394; *Gunn v Good Luck Truck Rental,* 85 AD2d 567), we find that the subsequent *Nowlin* decision is applicable to the matter before us and note there is no mention in either case of prior accident history while in *Gunn* there is testimony establishing that "the city in practice confined itself to the maintenance function" (85 AD2d, *supra,* at 568); here, there was evidence that the City had undertaken to replace the side guardrails along the Parkway.

Accordingly, the order of Supreme Court, Bronx County (Gerald Esposito, J.), entered May 13, 1996, which, upon a directed verdict, dismissed the complaint as against the City of New York, should be reversed, on the law, without costs, and the complaint reinstated as against the City and the matter remanded for further proceedings.

ROSENBERGER, ELLERIN and TOM, JJ., concur.

Order, Supreme Court, Bronx County, entered May 13, 1996, reversed, on the law, without costs, the complaint reinstated as against the City and the matter remanded for further proceedings.