[725 NYS2d 10]

In the Matter of CITY OF NEW YORK, Respondent, v STATE OF NEW YORK et al., Appellants.

First Department, May 1, 2001

APPEARANCES OF COUNSEL

*Ellen B. Fishman* of counsel (*Leonard Koerner* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for respondent.

*Deon J. Nossel* of counsel (*Robert A. Forte* on the brief; *Eliot Spitzer, Attorney General* of the State of New York, attorney), for appellants.

**OPINION OF THE COURT**

NARDELLI, J.

In this appeal, we are called upon to address a narrow issue of statutory construction, specifically, whether the term "such city" as set forth within the provisions of section 349-c (8-a) of the Highway Law was intended by the Legislature to include the City of New York.

## The Statutory Scheme

Article XII-B of the Highway Law (§ 349-b *et seq.*) was enacted in 1944 in order to create a Statewide system to administer State and federal funds earmarked for the construction and modernization of State arterial highways (*see,* Highway Law § 349-b; *Nowlin v City of New York*, 81 NY2d 81, 86). A State arterial highway has been defined as a highway which runs through a locality and connects it to the State highway system (*Nowlin v City of New York, supra,* at 86). The Legislature substantially amended article XII-B in 1945 (L 1945, ch 619) to authorize the construction of arterial highways in cities and specifically delineated certain New York City routes as part of the arterial system.[1]

Section 349-c (7) of the Highway Law, which was originally enacted in 1948, authorizes the New York State Commissioner of Transportation to "enter into a written agreement [with any city named in article XII-B] for the maintenance and repair" of State arterial highways passing through that city which were constructed, in whole or in part, with federal funds. The Department of Transportation has since entered into arterial highway maintenance and repair agreements (the agreements) with various cities across the State, including New York City.

The agreements, with some variance not relevant herein, provide that the city is to perform, or engage a contractor to

---

1. "Under article XII-B, the State is empowered to expend State or Federal funds for the purchase, design, construction or reconstruction of arterial routes running through cities." (*Nowlin v City of New York, supra,* at 86; *see also,* Highway Law § 349-c [1], [5], [6].)

perform, maintenance and repair on State arterial highways and that the State would thereafter provide compensation to the city at a rate based upon the area of the highways covered by the particular agreement. The agreements between the State and the cities, *with the exception* of the City of New York, have also incorporated the following clause since at least 1962:

"Article VII. GENERAL LIABILITY INSURANCE

*"The State shall furnish* without expense to the City, *general liability insurance with respect to the existence, maintenance and repair of the arterial highways*, and the insurance policy shall cover the interests of the State, the Commissioner and the city in the performance of this agreement, and shall also cover the State, Commissioner and the City for protective liability with respect to work or operations performed by a contractor of the City." (Emphasis added.)

The City of New York has provided for the maintenance and repair of the arterial highways passing through its borders since 1952 pursuant to an agreement with the State which has been amended on several occasions. That agreement, however, has quite relevantly *never contained a provision* requiring the State to provide liability insurance for the City of New York, or to indemnify it in any manner.

*The Current Amendment*

In October 1985, the State unexpectedly found that it was unable to procure liability insurance to cover those municipalities it was obligated to cover pursuant to the aforementioned agreements. As a result, legislation was proposed which gave the New York State Attorney General (the Attorney General) the power to appear and defend the interests of the State. The proposed legislation also made clear that the State would indemnify and save harmless the municipalities. That legislation was enacted in 1986 as subdivision (8-a) of Highway Law § 349-c and provides, in pertinent part:

"(a) Except as provided hereafter the state shall indemnify and hold harmless *such city* for any and all liability for damages for personal injury, injury to property or wrongful death for losses * * *

"(c) The city shall be entitled to representation by the attorney general in any claim described in

paragraph (a) of this subdivision, provided, however, that the city shall be entitled to itself defend any such action, proceeding, claim or demand whenever the attorney general determines, based upon his investigation and review of the facts and circumstances of the case that representation by the attorney general would be inappropriate, or whenever a court of competent jurisdiction determines that a conflict of interest exists and that the city is entitled to be separately represented. Whenever the municipality is entitled to defend the action itself, the state shall reimburse the municipality for any and all costs and expenses, including, but not limited to, counsel fees and disbursements.

"(d) The state shall indemnify and save harmless *such city* in the amount of any judgment obtained against *such city* in any state or federal court in any claim described in paragraph (a) of this subdivision, or in the amount of any settlement of such claim, or shall pay such judgment or settlement; provided, however, that the act or omission from which such judgment or settlement arose occurred while the city was acting within the scope of its functions for maintenance and repair of state arterial highways; provided, further, that no stipulation of settlement of any such action, proceeding, claim or demand shall be made or executed without approval of the attorney general and of the commissioner of transportation or his designee. Payment of any claim made pursuant to settlement shall not exceed the sum of fifty thousand dollars. Nothing herein shall authorize the state to indemnify or save harmless with respect to punitive or exemplary damages." (Emphasis added.)

The City of New York (hereinafter referred to as the City) first demanded that the State defend and indemnify it pursuant to Highway Law § 349-c (8-a) in 1992, approximately six years after the enactment of the legislation. Those requests were declined. In 1996, the City sent notice to the Attorney General of 12 additional tort claims involving personal injury, damage to property, and/or wrongful death arising out of incidents which occurred on various State arterial highways located within the City's borders. The City, pursuant to subdivision (8-a), demanded that the Attorney General represent the

City and provide a defense to the claims, and that the State indemnify it for any losses.

The State agreed to defend the City with regard to two of the claims, pursuant to Highway Law § 12 (2-a),[2] which implicates the State's obligation to indemnify municipalities for tort claims arising from the municipalities' performance, under agreements with the State, for the control of snow and ice on State highways. The State contends that nothing in the legislative history of section 12 (2-a) of the Highway Law indicates that the City was to be excluded from coverage. Moreover, the Attorney General emphasized that the State's prior agreements with the City for the control of snow and ice on the City's arterial highways contain the same indemnification and representation clauses as do the State's agreements with other municipalities.

The State, however, declined to acquiesce to the City's demands to provide a defense or indemnify the City with regard to the remaining 10 claims. In a letter to the City's Department of Law dated January 10, 1997, the Attorney General's office opined that "[a] review of Highway Law § 349-c, its legislative history, the maintenance and financial assistance agreements between the City and the State, and Highway Law § 349-f reveals that the City does not fall within the category of 'such city' as referred to at Highway Law § 349-c (8-a [e] [sic])."

*The City's Claims*

The City commenced this combined CPLR article 78 proceeding/ declaratory judgment action by the service of a notice of petition and petition in February 1997 seeking a declaration that the phrase "such city" as set forth in subdivision (8-a) applies to the City, and that the State is obligated to defend and indemnify the City from all claims arising from its repair and maintenance operations on State arterial highways. The City also sought a judgment directing the Attorney General to represent the City in the 10 actions enumerated therein and to reimburse the City for its costs and expenses in defending those claims to date. The State cross-moved to dismiss the petition and the City, after being refused representation by the State in additional claims arising out of accidents on the City's arterial highways, served an amended petition as well as two additional petitions. The three proceedings were then consoli-

---

2. Section 12 (2-a) of the Highway Law was enacted as part of the same bill as subdivision (8-a).

dated under index No. 400591/97 by stipulation and order entered March 3, 1998.

The Supreme Court, in a decision, order and judgment entered on June 16, 1999, dismissed the article 78 proceeding as asserted against the State only, sustained that proceeding as to the Attorney General, and found that it had jurisdiction over the causes of action for a declaratory judgment. The court, with regard to the merits of this matter, first noted that the parties agreed that the reference to "such city" in subdivision (8-a) refers back to the phrase "a city" as set forth in section 349-c (8), which provides in relevant part:

> "Such agreement for maintenance and repair as authorized by this section, shall include the procedure and method for regulation of street openings, and appropriate provisions for the care, protection and patching of the pavement or pavements, and curbs, the care and protection of drainage facilities and structures, the maintenance of adjacent roadside and landscaped areas * * *. Such maintenance and repair, whether done by *a city* pursuant to an agreement therefor as authorized by this section, or by the state because of the absence of such agreement, as the case may be, shall not include (a) services * * * which * * * are deemed to be the normal maintenance of streets by such city in which they are located, or (b) any work on or in connection with subsurface installations and structures that are owned and operated by any city." (Emphasis added.)

The court acknowledged that the State and the City have, since 1952, executed an ongoing series of agreements pursuant to which the City has maintained and repaired its arterial highways, and that the State's authority to enter into such agreements is derived from section 349-c (7), which provides, in relevant part:

> "The commissioner of transportation and any city named in this article, acting through the mayor or other administrative head thereof, pursuant to a resolution of the governing body of *such city except the city of New York*, are authorized to enter into a written agreement for the maintenance and repair * * * of any public street, main route or thoroughfare or portion thereof * * * which is within the

boundaries of such city and which is now or which shall hereafter be designated in this article." (Emphasis added.)

Finally, the court rejected the State's argument that the City's obligation to maintain and repair its arterial highways derived from section 349-c (3.4) of the Highway Law and concluded that the use of the phrase "such city" in subdivision (8-a) of the Highway Law is clear and unambiguous and includes the City; and "that the provisions of section 8-a apply with equal force in respect of the City of New York as it applies to all other cities." The State appeals and we now reverse.

### Discussion

The parties' primary arguments on appeal center around the intent of the Legislature in enacting subdivision (8-a) and to what extent the legislative history and intent is relevant to this appeal. The State maintains that a review of the legislative history leading to the enactment of subdivision (8-a) makes it clear that it is inapplicable to the City and that any contrary interpretation would alter the long-standing allocation of liability between the parties without any indication that the Legislature intended such a fundamental change. The City, on the other hand, contends that the statutory language is clear on its face and that absolutely no reason exists to look beyond the literal language of the statute. The City additionally maintains that in any event, the legislative history supports its position that the statute was not intended to exclude the City.

Initially, we reject the City's characterization of the language of subdivision (8-a), and specifically the use of the term "such city," as "clear and unambiguous." Indeed, Highway Law § 349-c (7), which authorizes the commissioner of transportation to enter into agreements for the repair and maintenance of arterial highways, provides, in relevant part, that:

> "The commissioner of transportation and any city named in this article, acting through the mayor or other administrative head thereof, pursuant to a resolution of the governing body of *such city except the city of New York*, are authorized to enter into a written agreement for the maintenance and repair." (Emphasis added.)

Thus, the reference to "such city," at least as set forth in section 349-c (7), is exclusive of the City and while that may not be

determinative as to the meaning of that phrase in subdivision (8-a), it certainly cannot be classified as clear and unambiguous. Notwithstanding the foregoing, even if we were to find that subdivision (8-a) was, in fact, unambiguous on its face, that finding would not be dispositive on appeal, nor would it foreclose our review of subdivision (8-a)'s legislative history in order to discern the Legislature's intent.

### The Law

As a general rule, the unambiguous language of a statute is determinative, as the words of the statute are the best evidence of the Legislature's intent (*Doctors Council v New York City Employees' Retirement Sys.*, 71 NY2d 669, 674; *Matter of Washington Post Co. v New York State Ins. Dept.*, 61 NY2d 557, 565). The Court of Appeals, however, in a decision handed down just months ago, noted that the foregoing boundary is not hard and fast and that even though the language of a statute is clear, it is appropriate to examine its legislative history, for the primary consideration of the courts in interpreting a statute is to " 'ascertain and give effect to the intention of the Legislature' " (*Riley v County of Broome*, 95 NY2d 455, 463, quoting McKinney's Cons Laws of NY, Book 1, Statutes § 92 [a], at 177; *see also, Matter of Pirro v Angiolillo*, 89 NY2d 351, 357 [" '[t]he letter of a statute is not to be slavishly followed when it leads away from the true intent and purpose of the Legislature' (McKinney's Cons Laws of NY, Book 1, Statutes § 111, at 226-227)"]; *Abood v Hospital Ambulance Serv.*, 30 NY2d 295, 298 ["the literal language of the statute, where it does not express the statute's manifest intent and purpose, need not be adhered to"]; *New York State Bankers Assn. v Albright*, 38 NY2d 430, 437 ["[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination' "]).

In *Matter of Turner v Department of Fin.* (242 AD2d 146), this Court held that in a case that pits the principle of the literal interpretation of a statute against the intention of the legislative body which enacted that statute, the intention of the legislators must govern. " '[I]t is generally the rule that the literal meaning of the words used must yield when necessary to give effect to the intention of the Legislature. In the interpretation of statutes, the spirit and purpose of the act and the objects to be accomplished must be considered and given effect, and the literal meanings of words are not to be adhered to or

suffered to defeat the general purpose and manifest policy intended to be promoted'" (*Turner v Department of Fin., supra,* at 147, quoting McKinney's Cons Laws of NY, Book 1, Statutes § 111, at 225-226).

In addition to the foregoing, it has been held by the courts of this State, and acknowledged by its Legislature, that a valuable guidepost in discerning the intent of the Legislature in enacting a statute is the " 'history of the times,' " as well as the circumstances and events associated with, and leading to, the passage of the statute (*Riley v County of Broome, supra,* at 464; McKinney's Cons Laws of NY, Book 1, Statutes § 124, at 253; *see also, Fumarelli v Marsam Dev.,* 92 NY2d 298, 303). In *Matter of Sutka v Conners* (73 NY2d 395), the Court of Appeals emphasized this point and, noting that legislative intent is " 'the great and controlling principle' " (*id.* at 403, quoting *People v Ryan,* 274 NY 149, 152), opined that "[l]egislative intent may be discerned from the face of a statute, but an apparent lack of ambiguity is rarely, if ever, conclusive * * * Generally, inquiry must be made of the spirit and purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history." (*Matter of Sutka v Conners, supra,* at 403.)

### The Legislative Intent

In light of the foregoing analytical framework, it is necessary to briefly revisit the historical backdrop to the enactment of subdivision (8-a). The State has maintained an arterial maintenance and repair agreement with the City since 1952 which, despite numerous amendments, has never contained a provision requiring the State to indemnify the City or obtain liability insurance on its behalf. In stark contrast, the State's maintenance and repair agreements with *every other city* but the City of New York have, since at least 1962, contained a standard provision requiring the State to furnish general liability insurance. Further, there is no dispute whatsoever between the parties that the State's sudden inability in 1985 to obtain such liability insurance prompted subdivision (8-a)'s enactment.

A review of the legislative Bill Jacket (Senate Bill S 9073, Bill Jacket, L 1986, ch 568) sheds further light on the intent of the Legislature. In a State of New York Department of State memorandum dated July 9, 1986, Executive Deputy Secretary of State James N. Baldwin averred that "[t]he impetus for this legislation came from the State's inability to procure liability

insurance as of October, 1985, to cover both the State and the municipalities involved * * * [T]his proposed legislation *merely codifies an existing indemnity relationship* which has been maintained administratively for many years" (*id.* [emphasis added]). In a memorandum for the Governor dated July 9, 1986, then Attorney General Robert Abrams noted that "the proposed legislation would remedy the existing problem caused by the State's inability to obtain insurance coverage." (*Id.*) The State of New York Department of Transportation, in discussing the need for the legislation, concluded that "[n]otwithstanding the lack of insurance, the liability of the State, under the contracts and under law, remains." (*Id.*) Senator Norman J. Levy, the sponsor of the bill, in a letter to the Counsel to the Governor dated July 14, 1986, explained that the legislation was intended to "remedy the existing problem caused by the State's inability to obtain insurance." (*Id.*) Likewise, a report by the Division of Budget noted that the legislation was intended "to indemnify *those affected municipalities.*" (*Id.* [emphasis added].)

Noticeably absent from the Bill Jacket, however, is anything which might suggest that the Legislature, in enacting subdivision (8-a), intended to alter the apportionment of liability between the State and the cities, and, specifically, to add the City of New York in the statute's protective envelope. Moreover, because the State's maintenance and repair agreement with the City did not require the State to furnish liability insurance, the rationale behind the Legislature's enactment does not support its application to the City. The City's argument that it was also unable to obtain insurance coverage for its maintenance and repair functions is inapposite as the bill was clearly introduced by the drafters to remedy the *State's* inability to obtain insurance and, thereby, fulfill its contractual obligations.

The Division of Budget's report also provides the following assessment of subdivision (8-a)'s budgetary implications:

> "DOT had anticipated spending $200,000 in 1986-87 on insurance premiums; following an administrative transfer this money could be applied to any judgements or settlements. The Department estimates that in recent years, claims against the municipalities totalled approximately $225,000 annually." (*Id.*)

The Attorney General's Legislative Program memorandum echoes the foregoing estimates regarding the fiscal impact of the legislation and states:

.

"it is anticipated that the bill would not subject the State to increased expenditures overall, because the cost of additional staffing in the Attorney General's office and for payment of claims should not exceed the amount currently paid for insurance premiums." (*Id.*)

Clearly, these budgetary projections did not contemplate that the State would assume liability for claims the City had previously been responsible for, as prior to the enactment of subdivision (8-a), the State spent nothing to insure the City. To further illustrate this point, the claims delineated in the City's petitions, which arose in a relatively short 16-month period between September 1995 and January 1997, seek as much as $100,000,000 in damages and reflect the magnitude of the liabilities which face the City, certainly a burden on the State not contemplated by the bill's drafters.

Finally, we agree with the City that it is not estopped from seeking benefits under subdivision (8-a) as the result of its failure to make any claims under the statute for six years following its enactment. However, the State's claim in this regard is not based on estoppel, but rather on the premise that the City's actions in not seeking representation or indemnification under subdivision (8-a) until 1992, which requests were rejected by the Attorney General, and not commencing legal action to enforce its purported rights until another four years had passed, indicates the City's own awareness that subdivision (8-a) does not apply to it. In that respect, it has been held that in those cases when a legislative enactment is susceptible to more than one reasonable interpretation, the practical meaning attached to it by the parties affected by it, when acquiesced to over an extended period of time, is highly persuasive (*Shoreham-Wading Riv. Cent. School Dist. v Town of Brookhaven*, 107 AD2d 219, 224, *appeal dismissed* 65 NY2d 990; McKinney's Cons Laws of NY, Book 1, Statutes § 128).

In sum, considering all of the circumstances leading to the enactment of subdivision (8-a), including the clear and unmistakable intent of the Legislature to provide a means by which the State could fulfill its contractual obligations to certain cities in the face of the State's inability to acquire liability insurance, coupled with the lack of any indication that the Legislature intended for the State to undertake the enormous burden of representing and/or indemnifying the City, we now conclude that "such city," as used in subdivision (8-a), does not apply to the City of New York.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Phyllis Gangel-Jacob, J.), entered June 16, 1999, which, to the extent appealed from as limited by the briefs, declared that the phrase "such city" in section 349-c (8-a) of the Highway Law includes the City of New York and that the provisions of subdivision (8-a) apply with equal force to the City of New York, directed the Attorney General to perform "his duty" with respect to New York City as set forth in subdivision (8-a), and implicitly denied the respondent's cross motion to dismiss this proceeding, should be reversed, on the law, without costs, the cross motion granted and the consolidated proceeding dismissed except to the extent that it is declared that the phrase "such city" within the provisions of Highway Law § 349-c (8-a) does not include the City of New York.

SULLIVAN, P. J., ELLERIN, LERNER and FRIEDMAN, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered June 16, 1999, reversed, on the law, without costs, respondent's cross motion to dismiss this proceeding granted and the consolidated proceeding dismissed except to the extent that it is declared that the phrase "such city" within the provisions of Highway Law § 349-c (8-a) does not include the City of New York.