OPINION OF THE COURT
Michael E. Hudson, J.
Defendant has moved for summary judgment dismissing each of the above claims.[1] Claimants have cross-moved for summary judgment. On consideration, the motion and cross motion will be denied.
The above claims arise from the deaths of Shannon Parmerter and John H. Mattia on the early morning of May 1, 2004, after socializing together at several bars or clubs.[2] It is alleged that the decedents died after they traveled northbound[3] on Fuhrmann Boulevard in the City of Buffalo in Mr. Mattia’s vehicle, *642 and failed to negotiate a 90-degree right turn as a section of that roadway ended at Commerce Street, just to the south of the Union Ship Canal. Instead, they reportedly drove through a guide rail along the north side of Commerce Street and entered the canal, where they drowned. The accident was unwitnessed, and was not discovered until the morning of May 2, 2004, when officers from the Buffalo Police Department Underwater Recovery Unit found their bodies within the Mattia vehicle in the canal, as they attempted to locate another vehicle that had entered that waterway from the opposite side of Fuhrmann Boulevard on the night of May 1-2, 2004. The Parmerter/Mattia deaths have resulted in related litigation in Supreme Court, Erie County, in each instance against the City of Buffalo, Niagara Frontier Transportation Authority, County of Erie and City of Lackawanna, with the Parmerter estate also seeking recovery against Niagara Mohawk Power Corporation and the Mattia estate.[4]
The claims against the State relate to the reconstruction of Fuhrmann Boulevard in the area of the Union Ship Canal between 1988 and 1992. Claimants contend that defendant’s Department of Transportation (DOT) was negligent in its design, construction, maintenance and/or inspection of Fuhrmann Boulevard on its approach to the canal, and its intersection with Commerce Street, such that there was a dangerous curve adjoining the canal that was not adequately shielded with guide rails or other barriers. Other allegations of negligence include inadequate sight distances, lighting, signage, speed regulation and traffic control devices, as well as the claimed failure of the DOT to review and reevaluate its traffic plan and roadway design in light of its actual operation and accident history, and to properly maintain its signage and barriers following the initial construction.
The State now moves for summary judgment dismissing the claims on the ground that it does not own or maintain the area of Fuhrmann Boulevard in question, and has not been responsible for that site since it accepted the reconstructed roadway in April of 1992. In addition, defendant contends that its initial *643 placement of signage, line striping and advisory speed determinations were proper, and that any subsequent needs for maintenance and reassessment would have been the sole responsibility of the City of Buffalo, as the alleged owner of Fuhrmann Boulevard in the area of the Union Ship Canal. The State also cites evidence of each decedent’s intoxication as a basis for dismissal. Claimants, in turn, have disputed whether the City of Buffalo fully and properly accepted control over the accident site following the completion of construction, and whether the State would otherwise be relieved of responsibility in relation to the initial construction and subsequent maintenance. On those bases they urge denial of the State’s motion, and, evidently, an affirmative grant of summary judgment in their favor. I lastly note that, at my request, the parties have addressed whether the provisions of Highway Law article XII-B, which undisputedly provided the authority for the DOT to undertake and pay for the reconstruction of Fuhrmann Boulevard as an arterial highway, would impact on the State’s duties and potential liability following the completion of the project. For reasons that follow I must now deny summary judgment to any party.
Summary judgment is a drastic remedy, one which should not be granted where there is any doubt as to the existence of a triable issue of fact (Rotuba Extruders v Ceppos, 46 NY2d 223, 231 [1978]; Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957]), with issue finding rather than issue determination the focus of the court in reviewing the submissions (Sillman, 3 NY2d at 404). All evidence must be viewed in a light most favorable to the nonmoving party (Rotuba Extruders, 46 NY2d at 231). To obtain such disfavored relief a movant must establish his cause of action or defense “sufficiently to warrant the court as a matter of law in directing judgment” in his favor (CPLR 3212 [b]), and must do so by tender of evidentiary proof in admissible form (Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067 [1979]). The failure to satisfy that initial burden requires the denial of motion, without considering the sufficiency of the opposing papers (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]). Conversely, once a movant has satisfied that burden the party opposing the motion would have the burden of showing facts sufficient to require a trial of any issue of fact, or demonstrate an acceptable excuse for the inability to tender such proof in admissible form (CPLR 3212 [b]; Friends of Animals, 46 NY2d at 1067-1068; Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). Lastly, in weighing *644 claimants’ evidence in opposition to defendant’s motion I must consider that “there is a less stringent evidentiary standard applied in wrongful death cases, particularly where there is no eyewitness to the accident” (Pontello v County of Onondaga, 94 AD2d 427, 432 [1983]).
According to David R. Christopher, who presently serves as the resident engineer for the DOT’s North Erie County Residency[5] (see affidavit in support of Richard B. Friedfertig, sworn to Aug. 29, 2011 [Friedfertig affidavit], exhibit R [affidavit of David R. Christopher, sworn to Aug. 28, 2011, with attachments]),[6] Fuhrmann Boulevard in the area in question was reconstructed between 1988 and 1992 under contract No. D500769 as a state-administered contract for a roadway owned by the City of Buffalo pursuant to Highway Law §§ 349-c and 349-e. As part of the project the State initially declared the site to be a restricted highway in and about 1988. According to Mr. Christopher that restricted status, and with it the State’s control of the site, would have ended no later than April 3, 1992, when the State formally accepted the completed contract. Based upon his review of the record plans for the reconstruction project, and his duties as the resident engineer for the area in question, Mr. Christopher opined to a reasonable degree of engineering certainty that the section of Fuhrmann Boulevard within the City of Buffalo wherein the accident reportedly occurred was owned by the City, and not the State. He also averred, again with engineering certainty, that following the State’s acceptance of the project it was the City of Buffalo, and not the State, that possessed maintenance responsibility for that roadway in the area involved. The resident engineer further observed that, by reason of its ownership and maintenance responsibilities, the City was free to review and implement both signage and/or design changes as it deemed appropriate over the 12 years that transpired between the project’s acceptance and the Parmerter/Mattia accident.
Mr. Christopher also made note of records memorializing that representatives of the City of Buffalo participated in a final inspection of the project on December 17, 1991, and that two of the City’s sewer and lighting representatives then accepted the *645 work. Those records also reflected a subsequent conditional acceptance by City of Buffalo Department of Public Works Acting City Engineer Lawrence N. Grasso, PE., that limited his protest to another component of the project. In addition, Mr. Christopher cited a reference within the DOT’S final acceptance report that the City of Buffalo had provided a verbal acceptance of the project. He also made reference to certain record drawings from the DOT that purportedly reflect the City’s maintenance obligations for the area involved (see exhibit R, sheet 28). Significantly, the chart that makes note of the City’s maintenance responsibilities expressly cites Highway Law § 349-c as the “ [authority” for that obligation, yet Mr. Christopher made no mention of that statute in opining on the issue of city ownership and maintenance responsibility.
In further support of its contention that the City of Buffalo possessed exclusive maintenance responsibility for Fuhrmann Boulevard after the project was completed defendant has tendered various deposition excerpts, including those of Donald Joseph Foleto, an assistant engineer within the City of Buffalo’s Department of Public Works (see Friedfertig affidavit, exhibit W [excerpts of examination before trial of Donald Joseph Poleto]).[7] While acknowledging a lack of knowledge with respect to the reconstruction project in question, Mr. Poleto did report that upon the completion of such a contract a city engineer would inspect the work site to determine compliance with the contract, before acceptance. He also acknowledged that in 1995 or 1998 he was directly involved in the City’s installation of certain chevron signs in the Fuhrmann Boulevard area, to replace signs that had become missing in the years that followed the initial reconstruction. Similarly, deposition excerpts from John D. Bidell, also employed by the City of Buffalo’s Department of Public Works (see Friedfertig affidavit, exhibit Y [excerpts of examination before trial of John D. Bidell]),[8] support that at the time of the incident the section of Fuhrmann Boulevard in question was maintained exclusively by the City of Buffalo, with those functions including all roadway surfaces, lighting, striping, signage, landscaping and drainage (id. at 56).
In addition to alleging a lack of ownership and maintenance responsibilities the State has urged that the initial manner of signage placement, advisory speed and line striping all fell *646 within the standards set forth within the New York State Manual of Uniform Traffic Control Devices (MUTCD) promulgated in 1983, and applicable to a project initiated during 1988. In support of that claim defendant offered an affidavit of Angelo Borgese, sworn to August 29, 2011, with attached excerpts from the project’s record plans and the MUTCD (see Friedfertig affidavit, exhibit S). Mr. Borgese, a licensed professional engineer who serves as a regional traffic operations engineer in the DOT’s Traffic and Safety Division, made note of the specific curvatures involved for the turn from Fuhrmann Boulevard east onto Commerce Street, as well as the other curves that facilitated the flow of traffic along Fuhrmann Boulevard to the north and south of the Union Ship Canal, and what he deemed to be the appropriate use of signage in light of an advisory speed of 15 miles per hour that the State had posted in 'that area. Moreover, defendant has tendered an affidavit from Kelly Thompson, also a licensed professional engineer, and a former DOT employee now in the private sector, which addressed the manner of the project’s construction (see Friedfertig affidavit, exhibit T). Ms. Thompson has opined to a reasonable degree of engineering certainty that both the design and the actual reconstruction of Fuhrmann Boulevard and the accident site conformed with the New York State Highway Design Manual and the 1983 MUTCD, as well as AASHTO[9] Geometric Design Guidelines. Ms. Thompson further affirmed that the guide rail system in the area of the Union Ship Canal was installed for the purpose of shielding the columns or piers that supported the elevated section of roadway over Commerce Street and the canal, which she described as fixed objects or obstructions. She noted that the accident occurred along a curved transition area, rather than the points of need where the columns were located, and that decedents’ vehicle penetrated the guide rail as a result of striking that device at a speed and angle greater than its design standards. Ms. Thompson offered further comments disputing the propriety of concrete jersey barriers or attenuators along the canal, although as a matter of present opinion, rather than a historic review of initial design considerations. The engineer also represented that protection from the canal was not otherwise necessary, since traffic control signs were posted, and the waterway was beyond the adjoining roadway’s clear zone.
*647 I note that Mr. Borgese and. Ms. Thompson have also asserted that the City of Buffalo was responsible for the roadway and signage following the completion of the reconstruction project. However, as with Mr. Christopher, neither Mr. Borgese nor Ms. Thompson discussed the significance of Highway Law article XII-B in that regard.
The State also urges that even in the absence of formal agreement, the informal acceptance of maintenance and repair responsibilities by the City has relieved it from any duty in that regard.
In my view, defendant’s opinion evidence regarding the State’s lack of responsibility for the area of the accident must yield to the provisions of article XII-B, and the case authority interpreting those provisions. That statute, originally enacted in 1944, created “a State-wide system for the use of State and Federal funds in the construction and modernization of State arterial highways” (Nowlin v City of New York, 81 NY2d 81, 86 [1993]). State arterial highways are roadways running through localities that connect to state highways (Nowlin, 81 NY2d at 86; Albanese v City of New York, 5 NY3d 217, 220 [2005]). In addressing those highways the statute distinguishes between the City of New York and other cities in a number of respects. Significantly, “although the State has the ultimate responsibility for maintenance of state arterial highways located in cities, New York City is the only city that retains ‘jurisdiction’ over those roads” (Matter of City of New York v State of New York, 98 NY2d 740, 742 [2002], citing Highway Law § 349-c [3.4]). Thus, once the State has completed a construction or reconstruction project for an arterial highway within New York City, section 349-c (3.4) requires it to return jurisdiction to that city.[10] Even then, however, Highway Law § 349-c (7)-(9) “contemplates that the State retains continuing maintenance responsibility for state arterial highways it has constructed or reconstructed” (Nowlin, 81 NY2d at 86-87; but compare Albanese, 5 NY3d at 220 [which indicates that the State possesses the discretion— i.e., “may” — retain such maintenance responsibilities upon transferring jurisdiction to the City of New York]). In contrast, article XII-B makes no express provision for the State to return “jurisdiction” of constructed or reconstructed arterial highways to other affected cities. Rather, the statute recites a different *648 mechanism wherein those cities could undertake such maintenance responsibilities, that being through the negotiation of agreements for that purpose. Section 349-c (7) expressly authorizes the Commissioner of Transportation to enter into agreements with cities other than the City of New York for such maintenance and repair “under the supervision and subject to the approval of the commissioner,” for which those cities would receive a fixed annual payment from the State, regardless of whether those services were performed directly by the city, and/or a contractor hired by that city. Section 349-c (8) includes a reference to maintenance work being performed by the State itself, albeit in those circumstances where there is no agreement with a city. Section 349-c (8-a) provides for the State to indemnify and hold cities harmless for liability for damages for personal injury, injury to property or wrongful death arising from the performance of maintenance and repair work on those state arterial highways pursuant to their agreements. Section 349-c (9) allows the Commissioner to cancel an agreement where he deems the city’s maintenance and repair services to be inadequate. In my view, the above provisions make clear that the State’s relation to arterial highways outside of the City of New York under article XII-B is far more than a simple funding source for local roadway development, and that matters of control and liability following a highway reconstruction pursuant to that statute cannot simply shift to an affected city through the vacating of a construction-related restriction, and acceptance of the completed project by the DOT and city.
Conversely, I note that the implementation of the above provisions not only requires that the Commissioner engage in a construction, reconstruction or improvement of an arterial highway as provided under the Highway Law, but also issue an official order declaring that the public street, main route or thoroughfare, or portion thereof, is part of the state arterial system of highways for purposes of maintenance and repair (Highway Law § 349-d). None of the parties herein have addressed whether any such order had been issued with respect to the area of Fuhrmann Boulevard and the Union Ship Canal where the incident reportedly occurred. Without question, however, that area expressly fell within the listing of public streets “affected by” the provisions of article XII-B (see Highway Law § 349-e [City of Buffalo]), and Mr. Christopher made clear that both the reconstruction, and the source of maintenance responsibilities, derived from statutory provisions that, in my *649 view, anticipate such agreement-based allocations for cities other than the City of New York, subject to the State’s ultimate control.
Having reviewed article XII-B I cannot hold, as a matter of law, that the State would have been relieved from liability arising from the initial design and reconstruction or subsequent maintenance and repair of the area, irrespective of whether the City of Buffalo had accepted the completed project in late 1991 or the spring of 1992. My denial of relief is based in part on the lack of any evidence of a maintenance agreement with the City for the reconstructed Fuhrmann Boulevard,[11] and in part upon the ongoing control that the Commissioner of Transportation exerts over state arterial projects outside of the City of New York under article XII-B. Again, that statute at least arguably supports that the State would continue to be bound under traditional concepts of nondelegable duty of reasonable care for its role in the initial reconstruction of Fuhrmann Boulevard (see Friedman v State of New York, 67 NY2d 271, 283 [1986]), and in keeping that roadway in a reasonably safe condition in the years that followed (see id., citing Weiss v Fote, 7 NY2d 579, 584 [1960], rearg denied 8 NY2d 934 [I960]).
Defendant’s second ground for summary judgment, that its manner of design and construction of the highway between 1988 and 1992 complied with the MUTCD, certain AASHTO provisions, and the Highway Design Manual, and otherwise conformed with sound engineering principles, must similarly fail for several reasons. In that regard, I once again note that a question of fact exists as to whether the DOT would have continued to be responsible for the maintenance and repair of Fuhrmann Boulevard beyond April of 1992, in light of the apparent lack of a maintenance agreement with the City of Buffalo for the reconstructed highway, and the potential for retained responsibility for the roadway under article XII-B. That arguable duty for maintenance and repair is not only significant in its own right, but also in assessing whether the qualified immunity that might otherwise have attached to the State’s initial highway design determinations under Weiss v Fote (7 NY2d at *650 588-589), could be given effect in this instance. As the Court of Appeals made clear in Weiss v Fote, the planning entity possessed “a continuing duty to review its plan in the light of its actual operation” (id. at 587; see also Friedman, 67 NY2d at 284). Moreover, upon being made aware of a dangerous traffic condition the governmental body responsible for the highway must undertake reasonable study of the condition with an eye toward alleviating the danger (see Friedman, 67 NY2d at 284; Lifson v City of Syracuse, 41 AD3d 1292, 1294 [2007]). Here, the State undisputedly did nothing to review the propriety of its redesign of Fuhrmann Boulevard between 1992 and 2004, in the belief that it did not own or otherwise bear responsibility for that roadway. Assuming, however, that the State did possess ongoing control, and an ongoing duty for maintenance and repair, its failure to so act would undermine its claims of immunity under Weiss v Fote.
Based upon Ms. Thompson’s affidavit it appears that the State limited its purpose in the installation of guide rails along Commerce Street to the shielding of columns that supported an elevated roadway. The State’s expert offered opinions regarding the lack of practicality or sufficient distance to erect jersey barriers or other attenuators, and the lack of need for those devices in light of speed constraints, signage, and the location of the canal beyond the roadway’s clear zone, although all in a conclusory manner, and without any indication that some or all of those factors led to an affirmative judgment by the DOT not to erect barriers along the 90-degree intersections next to the canal, and instead to focus upon the shielding of support columns. In response, claimants’ expert, Richard N. Reisch, has opined, inter alia, that barrier devices with attenuators should have been constructed to help prevent vehicles from driving into the canal.[12] In addition, claimants have presented proof of a similar one-car accident in March of 1991, while construction was ongoing, wherein another operator reportedly drowned after failing to negotiate a 90-degree turn from Fuhrmann Boulevard onto Commerce Street, and entered the canal (see *651 Smith affidavit, exhibit A [accident report]).[13] Those considerations all cause me to question whether discretionary immunity could apply to the initial highway design, particularly where an accident at the construction site itself could arguably have afforded defendant with notice of the very danger at issue in this matter. In that regard, I also am mindful of the long-standing body of law addressed to the need to mitigate dangers at sharp curves and T-intersections (see e.g. Ferguson v Sheahan, 71 AD3d 1207 [2010]; McDonald v State of New York, 307 AD2d 687 [2003]; Brady v City of New York, 39 AD2d 600 [1972]). Thus, in my view issues of negligence in the initial design of the curve are presented for adjudication, although subject to proof at trial supporting that the DOT’s determination not to erect barriers at the turns onto Commerce Street should be afforded discretionary immunity.
Irrespective of the above, the State has failed in its initial burden of establishing, as a matter of law, that the roadway otherwise had been maintained in a reasonably safe condition on the night of the incident, under the ongoing duty of maintenance and repair that arguably existed by reason of article XII-B. That failure itself compels denial of the motion.
Lastly, I cannot find as a matter of law that operator intoxication was the sole proximate cause of the accident. I understand that there is lay opinion evidence that both Ms. Parmerter and Mr. Mattia were drunk at a point shortly before the accident. I also understand that the forensic toxicology report for each decedent reflects the presence of alcohol, although at levels that vary. Conversely, defendant has failed to offer any evidence that establishes the significance of either decedent’s measures of alcohol in assessing impairment. Moreover, even assuming operator intoxication, that manner of vehicle operation cannot simply be deemed the sole proximate cause of the accident. “It is axiomatic that proximate cause ordinarily is a question to be determined by the finder of fact” (Decker v Forenta LP, 290 AD2d 925, 926 [2002]; Derdiarian v Felix Contr. Corp., 51 NY2d 308, 314-316 [1980]). Clearly, an analysis of whether liability can attach for injuries resulting from defects in the design or maintenance of roadside guide rails or abutments can occur separately from the circumstances of the initial accident that preceded the guide rail failure (see Gutelle v City of New York, 55 NY2d 794 [1981]; Lattanzi v State of New York, *652 53 NY2d 1045 [1981], affg 74 AD2d 378 [1980]; Matter of Kirisits v State of New York, 107 AD2d 156 [1985]). The Court of Appeals has rejected the assertion that vehicle operator intoxication be simply deemed a supervening cause of an accident that would exonerate the State from liability for negligent highway construction (Humphrey v State of New York, 60 NY2d 742 [1983]). In my view, the State has failed in its initial burden of establishing that operator negligence was the sole legal cause of the accident and injuries, and claimants have otherwise tendered proof that the design and maintenance of the accident site could well have been factors contributing to Ms. Parmerter’s and Mr. Mattia’s deaths.
I will similarly deny claimants’ cross motion for summary judgment. The Mattia estate did not serve and file a notice of cross motion in support of its application, as required under CPLR 2215 (see Free in Christ Pentecostal Church v Julian, 64 AD3d 1153, 1154 [2009]). There is also some question as to whether the Parmerter estate has éven requested such affirmative relief under CPLR 2215. For those reasons I do not believe that the requirements for a notice of cross motion could be deemed a harmless defect or otherwise waived. Further, claimants’ submissions fail to establish as a matter of law that discretionary immunity for the DOT’s initial design and reconstruction of the site would not attach, or that the State would continue to be responsible for maintenance and repair functions, or that there was negligence in the design, reconstruction, repair or maintenance of the accident site.
Based upon the above, it is ordered, that the motion and cross motion are hereby denied.

. Notwithstanding the reference to CPLR 3211 (a) (2) within the original notice of motion, the State otherwise made clear within its initial and amended papers, and in the course of oral argument, that it sought relief pursuant to CPLR 3212 (b). Claimants have not urged any prejudice on that basis.

. For purposes of this motion I accept that the autopsy reports for Mr. Mattia and Ms. Parmerter each reflect the presence of alcohol. I also am mindful that an acquaintance, Shannon Hueber, believed that both of them were drunk as she observed them at a bar later on the night of April 30-May 1, 2004, and that they rejected offers by Ms. Hueber and her husband to drive them home (see affidavit in support of Richard B. Friedfertig, sworn to Aug. 29, 2011, exhibit N [excerpts of examination before trial of Shannon Hueber], at 15-17, 31-36). Instead, they reportedly declared an intent to travel to another bar, The Pier, on Fuhrmann Boulevard, in Buffalo (id. at 16-17, 35).

. On occasion Fuhrmann Boulevard is described as an east-west route, with the Mattia vehicle traveling eastbound just prior to the accident. I will rely upon the more common description of Fuhrmann Boulevard as a north-south route, with the decedents’ vehicle northbound as it approached Commerce Street. On that basis I also accept that Commerce Street and the adjoining Union Ship Canal are situated in an east-west direction.

. Although the pleadings in the Supreme Court lawsuits were not submitted, the parties have made significant use of the deposition records from those matters. I further note that the second accident, on May 1-2, 2004, has also resulted in litigation both in Supreme Court and in the Court of Claims (see attorney’s affidavit of Carrie L. Smith, sworn to Nov. 18, 2011, para 10, n 1). Certain deposition records from that litigation have also been submitted as part of this motion.

. Mr. Christopher was not the resident engineer for the area involved at the time of the reconstruction project, or at the time of the accident.

. Deposition excerpts from Mr. Christopher have also been tendered herein (see attorney’s affidavit of Carrie L. Smith, sworn to Nov. 18, 2011 [Smith affidavit], exhibit L).

. See also attorney’s affidavit of Carrie L. Smith, sworn to Nov. 18, 2011, exhibit I (Poleto deposition excerpts).

. See also Smith affidavit, exhibit J (Bidell deposition excerpts).

. By judicial notice, the American Association of State Highway and Transportation Officials.

. Based upon Matter of City of New York (98 NY2d at 741-742), I disagree with Mr. Jasen’s assertion that the jurisdiction-transfer provisions of section 349-c (3.4) would apply to cities other than the City of New York.

. Conversely, there is evidence in the record that the City was presented with a maintenance agreement for walks, handrails, curbing, conduit and sewers following the completion of the project (see supplemental affidavit of Peter M. Jasen, sworn to Dec. 6, 2011, exhibit 8 [C]; Common Council Proceedings, Jan. 1-Dec. 31, 1989; minutes of Jan. 10, 1989, item No. 37 [Maintenance Resolution], as later approved, in the minutes of Jan. 24, 1989, item No. 124).

. I reject the State’s assertion that Mr. Reisch’s apparent lack of a professional engineering license disqualifies him from offering opinion evidence with respect to the DOT’s reconstruction efforts. Mr. Reisch formerly-worked as an engineer in charge for the DOT in highway projects, and otherwise offered a sufficient foundation to address the reconstruction project herein. In my view, defendant’s challenge goes to the weight of his testimony.

. I note that the 1991 accident report may have been misidentified in Ms. Smith’s papers.